[No. S032146. Feb. 2, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MARTIN DANKS, Defendant and Appellant.

## Counsel

Musawwir Spiegel; and Lynne S. Coffin, State Public Defenders, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Eric L. Christoffersen and Lloyd G. Carter, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—A jury found defendant Joseph Martin Danks guilty of the first degree murder of Walter Holt (Pen. Code, §§ 187, subd. (a), 189),[1] and, based on the same attack, of assault by a person serving a life sentence, with force likely to produce great bodily injury which resulted in death (§ 4500). In a separate proceeding, the jury found true the special circumstance allegations that defendant had been previously convicted of six first degree murders. (§§ 190.1, subd. (b), 190.2, subd. (a)(2).) The jury set the punishment on both counts at death.

The case is before us on defendant's automatic appeal. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

### I. Facts

#### A. *Guilt Phase*[2]

##### 1. *Prosecution Evidence*

On August 23, 1990, defendant entered the California Correctional Institution in Tehachapi serving a sentence of 156 years to life. On September 21,

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The guilt phase was preceded by a September 1992 competency trial in which defendant was found competent to stand trial. No issues are raised regarding this proceeeding.

1990, at approximately 1:00 a.m., defendant attracted the attention of Correctional Officer Daniel Escobar, and told Escobar, "I murdered my cellie." Defendant's cellmate was Walter Holt. Defendant also said that the murder had occurred approximately three hours earlier, and that "he had told the floor officer five minutes ago, but she didn't believe him." Officer Escobar notified Correctional Officer Kathleen Brown and Sergeant Courtois in the prison's central control. Officer Brown did not attempt to stop him from calling Sergeant Courtois. Officer Escobar wrote a report on the incident after twice being asked not to by Sergeant Avery because Officer Brown had discovered the incident first. Officer Escobar felt he should write a report because he was the one who actually "phoned it in."

Defendant subsequently made two statements early that same morning describing the killing. In his first statement, which one of the interrogating officers wrote down as defendant spoke, defendant said, "They put me in with this guy and I was just sitting there. [H]e went up to bed. I waited 3 [hours]. I ripped off the thick part of the sheet [and] put it around his head and neck. [T]hen I pulled on the sheet with both hands. Then he went out for a second. [T]hen he said what the fuck. [H]is hands flew up in my face and neck. Then I kept squeezing. I felt his heart pulsating. I kept squeezing till it stopped then put a knot in the sheet. [T]hen I got down and got another piece of sheet. [W]ent back up to his bed put [it] around his neck and put it around my foot for a pulley and pulled it real tight and held for awhile. [T]hen I waited from 10:00 until the officer came by at I think at 12:30. [T]hen I told the officer I think I killed my cellie." After this statement was written down, defendant continued to talk with the officers for eight to 10 minutes. He told them that "he was on a mission from God to take and to kill these transients." He also made "a statement to the effect that he was supposed to kill old people." Defendant felt he was God's own voice on earth. Defendant was excited, very eager to talk, and perspiring profusely.

In his second statement, which was tape-recorded, defendant stated that he had decided to kill his cellmate (he did not know Mr. Holt's name) as soon as he was put in Mr. Holt's cell between 5:00 and 6:00 p.m. that evening. "The reason I did it, is because they charged me with six murders in the L.A. County Jail. They were all . . . trumped up charges, they were fake charges. I didn't kill anybody. I confessed to what I did. They insisted that they charge me with murder, so I sit in the cell. So finally, they screwed me around and gave me a stupid deal, instead of . . . giving me the death penalty. They gave me a dumb deal for six life sentences, consecutive. And I figured well, if I ever get a chance to kill somebody, I'll just kill them . . . . Just so they know that I really finally did kill somebody. Even if it was just an old man." Defendant felt "nothing" after the murder. When the topic of sharing a cell in the future came up, defendant said, "I'd like to be in a cell with somebody, it would give me somebody to talk to."

Dr. John Holloway, who in 1990 worked for the Kern County Coroner's Office, performed an autopsy on Mr. Holt. The cause of death was "hypoxia leading to asphyxia due to ligature strangulation." Mr. Holt probably lost consciousness in less than a minute and died soon thereafter.

Documentary evidence was introduced that at the time of the capital crime defendant was serving a sentence of six consecutive terms of 25 years to life, plus one year, for a total term of 156 years to life.

### 2. Defense Evidence

On September 21, 1990, Correctional Officer Kathleen Brown was employed at the Tehachapi correctional facility. At approximately 1:00 a.m., defendant told her, "I killed my cellie." She told Correctional Officer Escobar to radio and get medical personnel, "the lieutenant and the sergeant to our building." She did not mention Officer Escobar in her report. She did mention the people he contacted, with a reference that she had notified them. Officer Brown did personally notify the control sergeant, but could not recall to whom she spoke, and did not mention the call in her report.

### B. Special Circumstance Phase

The prosecution introduced documentary evidence defendant had six 1990 prior first degree murder convictions. The defense rested without presenting any evidence.

### C. Penalty Phase

#### 1. Prosecution Evidence

The prosecution introduced evidence regarding some of the circumstances underlying defendant's six prior murder convictions, and one stabbing in which the victim survived. On January 20, 1987, defendant was arrested. At the time of his arrest, he dropped a newspaper containing a knife that appeared to have wet blood on it. He was interviewed that day by Detective Addison Arce regarding a series of stabbings that had occurred "in approximately Koreatown of Los Angeles." Defendant described stabbing victims while they slept, dug through garbage, fought with others, or simply walked along. He did not know any of the people he stabbed. He indicated the incidents were not serious because the victims were "bums" or "transients." "It ain't nothing, man, three or four bums. I don't see what the big fucking deal is, what the big fucking deal is, man." Defendant did not believe anyone had died from his actions.

On November 19, 1989, defendant was a patient at Atascadero State Hospital. On that date, registered nurse Toni Christensen was approached by hospital patient Donald McCully. Mr. McCully had sustained numerous puncture wounds and was "covered in blood from his eyebrow down to his belt." In a statement to Sergeant Sue Murphy, security personnel for the hospital, defendant said he first tried to suffocate Mr. McCully. Mr. McCully was able to break free, at which point defendant stabbed him with a pencil. "He said he was trying to stab him in the heart, but the pencil broke, and at that point he began to stab him in the face area[.]" He was trying to kill Mr. McCully, but when the pencil broke, he attempted to poke out his eyes. He "seemed irritated because he did not kill Mr. McCully."

On November 12, 1991, Correctional Officer Granville Warren searched defendant's Tehachapi cell. He discovered an approximately five-inch-long sharp plastic stabbing weapon hidden in defendant's mattress.

On January 23, 1992, Correctional Officer Albert Carter was conducting unclothed body searches on certain Tehachapi inmates, including defendant, before they were released to the exercise yard. He removed the handcuffs from defendant, who began to get undressed. Officer Carter then removed the handcuffs from inmate Renaldo Navarez, and he also began to get undressed. Defendant then stabbed Mr. Navarez with a piece of metal so that it protruded from his head about "an inch back just over . . . the eye."

On January 26, 1992, Correctional Officer James Lundy observed a large quantity of smoke billowing out of defendant's Tehachapi cell. Defendant was removed from the cell. He had set fire primarily to personal papers and newspapers.

On April 17, 1992, Correctional Officer Monte Gould searched defendant's Tehachapi cell. He found an approximately five-inch-long "inmate-manufactured stabbing instrument that was produced from a wall outlet . . . and was cut in half and sharpened to a point." Defendant told Officer Gould he had concealed other weapons in the mattress. A subsequent search of the mattress revealed two more shanks.

On May 12, 1992, Correctional Officer Daniel Price performed a random search of defendant's Tehachapi cell. He discovered in the mattress a single-edge razor blade, an approximately three-inch-long copper wire, and an approximately six-inch-long sharp metal weapon.

On July 12, 1992, Correctional Officer David Goodman took coffee to defendant's Tehachapi cell. When the cup was half-full, defendant forcefully struck the cup with the back of his right hand; the spilled coffee slightly

burned Officer Goodman's leg. Defendant also yelled and struck Officer Goodman with his left hand. Defendant was subsequently moved to a cell where he would not have the opportunity to direct food items back at an officer.

Documentary evidence was introduced that defendant had suffered two felony drug convictions in 1984 and 1985. (Health & Saf. Code, § 11360.)

### 2. *Defense Evidence*

Michael and Peter Whyte, two of defendant's older half brothers, testified. When defendant was born in 1962, the Whyte family lived in a wealthy neighborhood in Bay City, Michigan. Defendant's mother, whose name at the time of trial was Karen Walls, was originally the family babysitter. She and defendant's biological father, Edward Whyte, were approximately 25 years apart in age.

Edward Whyte was a very intelligent man and the only son of a wealthy family. He had a significant drinking problem. He would have blackouts and not remember what happened for weeks at a time. Peter testified, "sometimes we were terrified."

Defendant's mother also drank. Defendant was primarily cared for by an older half sister and the housekeeper, Dora Howard, and was well taken care of. Karen and defendant lived with the Whytes approximately one and a half years.

When he was approximately 13, defendant came back to live with the Whytes for a couple of months. The Whytes now lived in a trailer on the Saginaw Bay. According to Peter, defendant "was pretty much a blank slate, clean slate, just a wide-eyed kid with a big grin on his face." Defendant became exposed to and participated in his half brothers' frequent drug use, which included marijuana, LSD, and PCP. Michael testified he had defendant "dealing stuff for me at the school." Michael also taught defendant how to play the guitar. Defendant was on friendly terms with his father. Defendant moved out because Peter was concerned about defendant's welfare and that defendant would get in trouble with drugs at school and lead the police back to the Whyte family.

In 1985 or 1986, defendant caused his half brother Michael to be evicted from his apartment because defendant was sleeping in the hall. Michael was subsequently evicted from a different apartment because defendant was illegally living next door in a vacant apartment.

Defendant briefly visited Peter and Peter's wife and child in 1986. Defendant had on dirty clothes, was unbathed, and was carrying a steak knife.

Both Peter and Michael had been, at some point, incarcerated for drug dealing. Another of defendant's older half brothers, Earl, suffered from drug-induced schizophrenia and had not worked since the 1960's. Peter stopped all illegal drug activity in 1984 when he became a Jehovah's Witness. He had been employed at the same location for eight years and was married and had three children at the time of trial.

Dora Howard testified she went to work as the Whytes' housekeeper when defendant was about two weeks old. She left in 1968, but remained acquainted with Edward Whyte until he died. According to Dora, Edward and Karen drank frequently. Karen, at least twice, put defendant in a dresser drawer and shut it when she grew weary of his crying. Defendant's natural parents also gave him "paragoric," which made him sleep for long periods of time. After Karen moved out of the Whyte home, Dora was called two or three times a month by Karen's neighbors because defendant had been left alone for a long time and was crying. Dora would go over to Karen's home and find defendant "wet and dirty," and also find "bottles with sour milk in them."

Dora further testified that when defendant was about 14 and associating with the Whytes, Edward Whyte became concerned for defendant's welfare and apparently did not want him to be in that environment. Edward told defendant "he didn't want him around anymore, and he wasn't a son of his, and to get out and never call him or come back."

Leroy Danks, defendant's adoptive father, testified. Leroy met defendant's mother Karen and defendant in 1965. Karen was 21, and defendant was approximately two and a half. At times Karen came home with other men and Leroy would leave. Leroy married Karen in 1966, and adopted defendant. "I didn't adopt him just for his name. I adopted him because I felt I wanted to." Defendant "always told [Leroy] he was real lucky, . . . luckier than most kids that he had two fathers." Karen left Leroy two or three times, taking defendant with her, to move back with the Whytes.

At some point the family moved from Michigan to South Dakota. They had "a nice house" with three bedrooms, a playroom, and a fenced yard. After six or seven months, they moved to Wyoming.

Leroy testified that defendant "was a good kid," and Leroy had no problem disciplining him; "I usually didn't have to speak over the second time." Leroy's only problem with defendant was his propensity to stay up late. Defendant loved to go fishing, and was always asking Leroy, whom he called "Dad," to take him.

During the marriage, Karen and Leroy had two more boys. Leroy left Karen in December 1970 when defendant was about eight because of Karen's relationship with Gene Walls. Karen later married Walls. Leroy did not see defendant after 1971 until defendant was about 14 because Karen and defendant moved back to Michigan.

Leroy further testified that when defendant was 14, Karen told Leroy she could not handle defendant any more and asked if he could live with Leroy. Defendant lived with Leroy for about a year. He told Leroy that Walls beat him for minor infractions and verbally abused him.

In 1981, when defendant was about 19 years old, he visited Leroy. During the visit he inexplicably took all the covers off the electrical sockets and stacked them in a neat pile.

In 1985, defendant joined Leroy on his trucking route. After the first day or so, defendant refused to go into cafes. Defendant told Leroy old people were chasing him, and he wanted Leroy to bring his food to the truck. Defendant also carried a steak knife for protection. Leroy purchased new clothes for defendant, and defendant was also given clothes by Leroy's friends. After approximately a couple of weeks together, defendant became angry in the truck for reasons unclear to Leroy, told Leroy he was not his "real dad," got out of the truck, took off the new clothes in the rain, put on his old clothes, and left. Leroy did not see defendant again "until I walked into this courtroom."

Karen Walls, defendant's mother, testified. Karen's mother died when she was three, her father when she was 14. She became romantically involved with Edward Whyte when she was 17. Edward had previously been a heroin addict. In addition to defendant, Karen had four other sons, one of whom had been put up for adoption.

Karen drank mildly during her pregnancy with defendant. Defendant was born two months premature and weighed three pounds 15 ounces. He was in an incubator for four to six weeks.

Karen moved out of the Whyte home a few months after defendant was born. She left for a variety of reasons, including the fact that she and Edward got into an argument and he broke her nose. Karen continued to see Edward, and would put defendant in a dresser drawer as a makeshift crib when she visited. She did not shut him inside the dresser.

Karen further testified that she married Leroy Danks in 1965, but he was unfaithful. She began her relationship with Gene Walls while she was still

married to Leroy Danks, and married Walls in 1972. Defendant did not get along with Gene Walls. When defendant was 12, Karen told defendant that Edward Whyte was his natural father.

In her testimony, Karen delineated aspects of her family's mental health history. Karen's grandmother suffered from schizophrenia, as did her grandmother's son. One of Karen's other sons suffered from a chemical imbalance.

Karen also described certain incidents, apparently to demonstrate defendant's mental health. Defendant fell off the bed when he was a month old, and was involved in two car accidents in 1977. In 1977, Karen was advised by a Dr. Franks that defendant was suffering from "some sort of psychiatric disturbance." Beginning in 1979, when defendant was 16 years old, until 1982, defendant hitchhiked for extended periods of time. When he was 16, he was arrested in Mexico, and his release was negotiated by Edward Whyte. During the years 1979–1982, defendant also began to wash dishes he took out of the cupboard before he would use them, and once moved all of Karen's wall hangings from eye level to the ceiling.

In May 1982, defendant made unusual statements, such as "Ronald Reagan smokes 10,000 weeds a day," and accused his mother and aunt of printing counterfeit money. He also said that his grandparents, all of whom were deceased, had spoken to him.

In October 1982, defendant walked into a New Jersey elementary school in shredded clothes. Upon his return to Michigan, defendant would go out in the backyard and start screaming at someone not visible to Karen to "shut up." At some point, defendant asked Karen to take him to the road so he could leave. She did so, and then persuaded him to get back into the car. Defendant said, "It won't stop. I've got to set myself on fire. I got to kill somebody so I can go to prison for the rest of my life." In October 1982 Karen had defendant involuntarily committed to a psychiatric hospital. After approximately two weeks he was given grounds access and left the facility. He was found in Florida and placed in a psychiatric institution there. As in Michigan, however, defendant walked away from the facility.

In late 1983, defendant lived with Karen for a couple of months. According to Karen, he "was still bizarre" and carried a knife for protection.

After defendant's 1987 arrest for murder but before his transfer to Atascadero, Karen spoke with him. Defendant told Karen his attorney, Larry Rivetz, was a vice cop, and there was a conspiracy against him that went all the way from Daryl Gates, to the mayor, to President Reagan. "Ronald Reagan gave the order and this is why all of this happened to him." Following his arrival at Atascadero and his placement on medication, he did not make statements about Ronald Reagan.

Dr. Robert Jackson, a professor of microbiology and Executive Associate Dean of the Southern Illinois School of Medicine, testified. In approximately July 1982, Dr. Jackson was taking a motorcycle trip from Illinois to the western United States. He picked up defendant, who was dressed lightly in inclement weather. The two traveled together for the next two days. Defendant had no money or identification. When Dr. Jackson asked defendant if he wanted to join him for coffee, defendant expressed fear they were being watched through the restaurant security camera, "glued himself . . . against the wall and the window," and "slink[ed] along." Later, at dinner, defendant ordered a box of cereal and milk, after ascertaining the milk would come in a box. He said he had been incarcerated in Mexico, and "knew that people put shit in the food, and because of that he was afraid to eat prepared food." Defendant remained reluctant to eat prepared food during the time the two traveled together.

At the motel that night, defendant expressed concern Dr. Jackson and defendant were being watched through the television set. During their stay at a motel the following night, defendant became upset by a courtroom scene and kicked the television set. Dr. Jackson turned the television off, and commented to defendant that something was troubling him. The two then had a discussion regarding defendant's life. Defendant felt discomfort because he was "born a bastard," he had had at least two stepfathers, his mother had married several times, and he hated his current stepfather. He was angry with his mother for creating an "injurious" environment, and because she did not come to defendant's aid. Defendant had self-inflicted round burn scars on his forearms. More than once during the trip he said "he particularly liked clean people and clean things and being with clean people. This was a theme." Dr. Jackson did not believe defendant was play acting or trying to act crazy. "I took this to be a young boy who needed help."

Peggy Walkowiak, who in June 1986 was a probation officer for the State of Michigan, testified. Ms. Walkowiak was assigned defendant's case after he pled guilty to attempted possession of a short-barrel rifle. She interviewed defendant and noticed unusual behavior. Defendant did not drink coffee, milk, or juice at the jail "because he believed that they might be trying to poison him." He washed his jail jumpsuit and refused to wear any others because he was afraid they were not clean. "He also talked about a motel room that he had shot up because it was too dirty, it wasn't clean enough. He was very concerned with his cleanliness and with other people out to get him." In her opinion defendant was paranoid.

Ms. Walkowiak initiated a mental health evaluation of defendant. She was dissatisfied with the psychiatric work-up. Ms. Walkowiak also interviewed defendant's mother, who relayed her belief defendant needed mental health

assistance. Defendant also had a long history of marijuana abuse. Ms. Walkowiak recommended the court incarcerate defendant in prison with substance abuse therapy and a psychiatric evaluation. In September 1986, the court placed defendant on probation, and he absconded within two weeks. Ms. Walkowiak had "never seen anyone with more mental health problems than [defendant] in the time that [she had] been doing this work." She did not feel he was "putting [her] on."

In 1987, Los Angeles County Deputy Sheriff Nick D'Angelo worked at the men's central jail. He testified he had daily contact with defendant for a period of over 10 months. "He was always extremely paranoid. He would say the system is railroading him. He would say his attorneys are against him. . . . [T]he whole system was out to get him . . . . Then an hour later, he would admit to" stabbing people, but say "I didn't kill those guys." Defendant said his food was poisoned, "that somebody is in the kitchen excreting in his food. He would state Burt Reynolds, Johnny Carson is down there, I know they're excreting in my food, and I want to pick my own tray." "It was practically a daily thing." Defendant would clean his cell on his hands and knees with a toothbrush an average of six to 10 times a day. "It was the cleanest cell I've ever seen." He believed he was being brainwashed by the music broadcast in the jail. Defendant's demeanor did not change when different people were around him. In particular, when Deputy Sheriff D'Angelo watched defendant through a one-way glass, he acted the same.

Daniel Grajeda, an inmate at Tehachapi, testified that prison deputies would tell defendant "they had put human sperm in his food. I seen the deputies come like antagonize him and mess with his mind." This was apparently why defendant threw his trays at the deputies. The deputies would also locate another "weird strange character" in a cell next to defendant, and the two would throw cups of urine, water, or human waste mixed with water at each other. The two would then be separated. When defendant thought he was hearing things or was possessed, Grajeda and others would "mess with him a little bit and accuse the KGB of messing with him." Because of the threats about human sperm, defendant preferred to pick his own food tray, and would become upset if he was not permitted to do so.

Defendant also introduced testimony apparently intended to demonstrate that Tehachapi officials should have been on notice regarding his violent character prior to September 21, 1990. In addition, defendant introduced expert witness testimony that if he were serving a sentence of life imprisonment without the possibility of parole, at least initially he would be isolated from other prisoners given the nature of his "behavior." However, defendant would still have opportunity to come into contact with others, such as prison

personnel administering any involuntary medication. Moreover, there was no guarantee he would not ultimately be returned to the general prison population.

Dr. Eugene Kunzman, a psychiatrist at the Los Angeles County jail, evaluated defendant and reviewed certain records at an unspecified time. He formed the opinion defendant had paranoid schizophrenia, an antisocial personality disorder, and a history of polysubstance abuse. Dr. Kunzman testified, "He was a very sick, disabled psychiatric patient, inmate at that time." According to Dr. Kunzman, breaking the law and rules, and lying or a lack of truthfulness, are fairly characteristic in someone with an antisocial personality disorder.

Dr. Robert Hill, a staff psychiatrist at Atascadero State Hospital, treated defendant when he was found incompetent to stand trial for the prior murder allegations in Los Angeles County. Defendant was at Atascadero from June 1989 to March 1990. Upon admission, defendant was diagnosed as having paranoid schizophrenia and an antisocial personality disorder. He also had a significant history of marijuana abuse. Defendant had a relatively low global assessment functioning score, which was even lower when he was discharged because of the staff's increased "knowledge[] of the extraordinary destructiveness of the homicidal potential of the patient."

Dr. Hill testified that "[h]allucinations and/or delusions are ordinarily present in most schizophrenic people," and that defendant was delusional. He explained that it is easier for schizophrenic delusions to control a person who also has an antisocial personality disorder because a person with such a disorder has fewer internal controls. Dr. Hill recalled one instance in which defendant "was becoming more delusional, and he loves that. He gets excited by it. It's a very happy state of being for him. . . . [W]hen he gets into his sickness, he's a happy camper because he's full of exotic violent themes and the wishes to kill. And this stems from a delusional self-concept that occupies his mind which is that he is righteously performing murders or harming people[,] something that he also enjoys greatly." Defendant described himself as a "bum buster." It "was his dedication to seek out and find bums and bust them, in his terms," and fellow Atascadero hospital patient McCully "fit that mold." Defendant "had a great desire in his delusional system to be able to follow disadvantaged people, . . . to track them, to kill them, homeless type people."

Dr. Hill further testified that when defendant was on Haldol, he became "less attentive" to the "very sick violent concepts that he had." There was "a modest remission of the more distracting psychotic features." When defendant was taken off Haldol for a trial period, he attacked McCully. The medication was resumed.

Defendant was referred to a neurologist because he was suspected of having a brain cyst. The "conclusion was [that] no such organic problem with his brain existed."

Ultimately defendant was found to be competent to stand trial; to remain so, he needed to be on medication. He nonetheless was "a serious and continuing homicidal threat." Dr. Hill "tried to express in [his] discharge document that this was an extraordinarily dangerous individual regardless of whatever level of psychiatric improvement he may have."

Dr. John Riley, a clinical psychologist at Atascadero State Hospital, ran tests on defendant approximately two months after he arrived at the hospital to determine his intellectual functioning, personality functioning, and his mental status. The Wechsler Adult Intelligence Scale indicated defendant had an I.Q. of 106, which placed him in the average range of intelligence. This test took an hour and a half on two separate occasions. Defendant "responded appropriately, was cooperative, [and] participated meaningfully in the process." While defendant told Dr. Riley there was nothing wrong with him, he scored high on two portions of the Minnesota Multiphasic Personality Inventory. One high score suggested defendant did not follow the instructions, did not understand what was going on, responded randomly, or suffered from a severe thought disorder. The other high score was on the schizophrenic illness scale. The "first impression of the computer printout" of his Rorschach inkblot test results also indicated "a distinct possibility he suffered from schizophrenia."

Dr. Riley further testified that defendant "swore he would never take[] medications at [the] Los Angeles County [jail], so we wanted to see if we could maintain the competent state off the medications." As noted earlier, defendant subsequently assaulted fellow patient McCully. Some of the psychological tests were administered when defendant was off medication, although Dr. Riley did not specify which ones.

By January 1990, Dr. Riley was of the opinion defendant was competent, and his schizophrenic illness was in remission while defendant was on medication. Defendant needed to be on medication to maintain a state of trial competency. Dr. Riley also believed defendant had "sociopathic tendencies, would be prone to lie and manipulate and [was] given to criminal acts." While defendant stated he did not believe the people he was alleged to have killed had actually died, the consensus of Dr. Riley and the rest of the treatment team was this was not a "psychotic denial, but rather a convenient denial, a sort of isolated phenomenon that he has fabricated to deal with the enormity of the situation." It was not a delusion related to his schizophrenia.

Dr. William Wirshing, a physician who was board certified in psychiatry and neurology, with a subspecialty in the study and treatment of schizophrenia, and who also was an associate professor at the University of California, Los Angeles, testified generally about schizophrenia. In Dr. Wirshing's opinion, available treatments do not cure but do decrease the manifestations of the illness. While it is possible a paranoid schizophrenic with a history of homicidal violence could be managed in a prison setting, "[t]here are schizophrenics who are beyond the reach of current medical technology." For 70 percent of paranoid schizophrenics, however, conventional "medications are helpful." Violence tends to decrease as a schizophrenic patient gets older.

Dr. Wirshing also reviewed some of defendant's medical records, but did not interview defendant. The records clearly indicated defendant's unwillingness in 1990 to take medication in the Los Angeles County jail. His Atascadero records indicated he was "at least partially treatment-responsive" to conventional medication. Dr. Wirshing was aware, however, that at the time defendant was discharged from Atascadero, he was still characterized as an extremely dangerous individual.

Dr. Robert White, a forensic psychologist, was appointed by the Los Angeles County Superior Court in March 1989 to evaluate defendant's competence to stand trial. He met with defendant and conducted a variety of tests. He also reviewed certain records and transcripts and consulted with defendant's attorney, Larry Rivetz, and Deputy Sheriff Nick D'Angelo. Several test results were consistent with a diagnosis of paranoid schizophrenia and indicated that at the time of the testing defendant was suffering from a psychotic episode. Defendant maintained that he had wounded, not killed, a number of people, and "that if he could get a private attorney, then he would be able to get an investigator hired that could go to the hospital and determine that the victims had been released and, in fact, were not dead." Defendant felt Mr. Rivetz was part of a conspiracy to prosecute him for nonexistent homicides. Dr. White concluded defendant appeared to be suffering from paranoid schizophrenia and an antisocial personality disorder and was incompetent to stand trial.

Four or five doctors evaluated whether defendant was competent to stand trial. One of them, Dr. John Stahlberg, found him competent. Dr. White was aware of an incident in which defendant attacked Mr. Rivetz in the courtroom. Defendant told Dr. Stahlberg the only way to get a new attorney is to hurt your attorney by cutting him, and defendant did not think his attorney was doing a good enough job.

In 1990, following defendant's stay at Atascadero, Dr. White again evaluated defendant in the Los Angeles County jail, conducting two interviews. He

learned defendant had very recently been taken off medication because of his adverse reaction. Dr. White testified that the types of medication plaintiff had been on can remain effective for some period of time after they are administered. During both interviews, defendant appeared to be under the effects of the medication. Defendant was very lethargic and did not manifest any delusional or psychotic thinking. Dr. White diagnosed defendant as suffering from paranoid schizophrenia, which was in remission due to medication. While defendant was competent at that time, there was a chance he could become incompetent again if appropriate medication was not administered.

Dr. Robert Bittle, a physician with a subspecialty in neuropsychiatry, evaluated defendant in January and March of 1992, and reviewed certain medical and social study reports. Dr. Bittle diagnosed defendant as suffering from paranoid schizophrenia and a personality disorder. Defendant "was flouridly [sic] psychotic, out of control and dangerous." He was convinced his food was being poisoned, and that his attorneys were in "cahoots" with the district attorney and trial judge and were plotting against him. Defendant stated there had been no deaths in the cases in which he had previously been convicted of six murders, and that he was worth $6 million because he was going to secure judgments in that amount for the false accusations. During one interview, defendant was convinced he and Dr. Bittle were being watched. Defendant could not interpret any of the proverbs given him, such as "you can lead a horse to water, but you can't make him drink," "indicating that he has a serious thinking disorder."

According to Dr. Bittle, defendant "is a sadist . . . . [W]hen I asked [defendant] to describe his feelings about the murders in Los Angeles, [he] became sexually excited. That is one of the motivations for Mr. Danks' behavior." In Dr. Bittle's opinion, even in a treated and improved condition, defendant "is an extremely dangerous individual."

A CAT scan administered to defendant in 1989 showed that defendant had a cyst on his brain. Dr. Bittle ordered a magnetic resonance imaging study (MRI), which was performed two months before his testimony. The cyst was half as large as it had been in the CAT scan. The two sides of defendant's brain were not symmetrical. Dr. Bittle also ordered a brain electrical activity mapping (BEAM) test. While it was "not very dramatic," this test indicated "there may, I emphasize may be some abnormalities, as far as the electrical activity in [defendant's] frontal region," and perhaps in defendant's left and right temporal regions. This test, "in itself, is not going to give you a definitive diagnosis or answer."

Dr. Bittle concluded defendant was "functioning abnormally, that he has organic brain dysfunction, as well as some mild damage to his brain." By

"organic brain dysfunction," Dr. Bittle was referring to the possible electrical discharge abnormalities. By mild brain damage, he meant there was a documented cyst, "some pressure or space occupying pressure on the brain," and some indication of abnormal electrical activity. By "mild," he meant "we can't find, we can't identify a specific infarct or a specific tumor in certain parts of the brain, which we could then clearly translate into this is the brain damage, this is the problem."

Dr. Bittle further stated that "individuals who have temporal lobe abnormalities can be seen as being impulsive, showing poor judgment. It's noted that they could be aggressive, and that they can be destructive, that they can have problems with memory concentration, and that they can have problems from the standpoint of . . . actual organic lesions that can cause schizophreniaform or clinical symptoms that mimic a classic schizophrenic disease." Factors such as genetics, low birth weight, head trauma, and drug abuse are important clinical data that one needs to have "in terms of understanding a particular person's brain functioning and general behaviors." Persons who abuse drugs in significant amounts over significant periods of time can show brain damage.

Dr. Bittle conceded that people with schizophrenic relatives do not necessarily develop schizophrenia. Moreover, "[i]t does not translate that all people with cysts are going to have problems." In addition, one can suffer brain dysfunction without brain damage. Simply because a person has brain damage or organic brain dysfunction, this does not necessarily mean they will be violent. In particular, the majority of people with frontal lobe dysfunction or temporal lobe damage are not violent. Likewise, the majority of people who have childhood head trauma, are born prematurely, or have low birth weight, do not become violent.

Defendant testified on his own behalf. Defense counsel made objections, but did not question defendant during his testimony.

Defendant said, "I would have pled guilty to this crime the very first day. I would have pled guilty." "There would have been no need for you and there would be no need for the money that was spent on this, because, obviously, it was an open and shut case. It is like I was caught red-handed."

Defendant implied he would continue to be violent in a controlled setting. "[W]hat I'm trying to say is, is that if you leave matches for a little kid to play with, he is going to play with them and burn himself, and I keep finding myself in these types of situations all of the time, and in jail . . . ." "I'm trying

to make it clear that if everything was just so hunky-dory and peachy-keen in prison, why am I being charged with Walter Holt and why did Mr. Dellostritto [defendant's counsel] get stabbed in his face . . . ."[3] "But what I'm saying is, this court seems to have picked up where God has abandoned us and saying, 'hey, man, we cannot allow someone to run wild out here,' and I did stab them bums in their back, in the back of their neck, in their side while they were laying down, while they were asleep, and I would do it to you too—."[4] "Let me rephrase it. Just as I done it to Mr. Dellostritto, I would do it to Mr. Eyherabide [defendant's other counsel] if I had a chance." "[T]hey sent me to the mental hospital after I practically slit Rodney's throat in the jail." "[I]f you are man enough to get into it, be man enough to get out of it, and I guarantee if I spend every last day of my life in prison, it is of no consequence to me, man, either way, and that should be made clear. Because just like in L.A., it was of no consequence. I knew from the day that I got arrested, and it ain't stopped me yet, and I ain't never going to stop, so even if I was to be let out here right now, I ain't going to stop."

Defendant also stated, "Mr. Holt was an old man, and I wasn't in the habit of trying to kill, as you heard before, about killing old people, like all of these bums were old. I had no idea that these bums were old, because they were so filthy and dirty, you could not tell what was what, but somehow somebody has the impression that I was out to get an old man or somebody . . . that's not correct."

"You know, and I'm not saying that you should feel sorry for me, because maybe this stuff warped my head when I was a kid . . . and because I was born a bastard." "I'm not saying that you should feel sorry for me, because I was 11 years old and here I am turning into a dope fiend." "But I would not change a thing that I did in my life. That is not to say I'm proud. As far as going to school and graduating and getting a job and doing . . . what seems to be the normal thing in this world, I'm the first one to admit that, in them respects, that I'm a coward, I'm the low[est] of the—I'm a slime ball, a grease ball, a scum bag." "I'm here to tell you today, that their not guilty by reason of insanity plea that saying you done it, you went out you stabbed this dude, and he supposedly died, and when you did it, you didn't know what you was doing, and it is like I'm standing there but I'm on Mars or something. I don't know how they can justify this and say you did it, but you don't know you did it. It is not like I was blowed out on my mind with dope and PCP, but I was smoking dope and cigarettes, but it is not like I was so

---

[3] During the penalty phase defendant twice stabbed Mr. Dellostritto in the face, and was headed toward the jury box when he was subdued by sheriffs. The jury was instructed that defendant's conduct at the counsel table was not admissible evidence, and could not be considered for any purpose.

[4] Following this statement, defendant was admonished by the trial court not to address his comments to the jury.

drunk that I don't know how I got home. It wasn't like that at all and they are trying to tell you that I'm absolutely crazy and I can't think and all of this. . . . I'm trying to tell you that I have no problem thinking, functioning . . . I have no trouble with my faculties. I can read. I can write. I can add, subtract, multiply. I can read my [prison rule handbook]. I can eat my food. I don't shit and piss in my pants, and I don't drool on myself, and it seems to me that they were trying to bring in the psychiatrist and tell you that I'm just a fucking moron that can't do anything, and that is absolutely incorrect . . . ."

### 3. *Rebuttal*

Dr. Theodore Badgley, a psychiatrist and neurologist, was appointed in June 1992 to determine whether defendant was competent to stand trial. He met with defendant and reviewed voluminous medical records. After reading many of defendant's records, and before interviewing him, Dr. Badgley was "preconditioned to think" defendant was "mentally ill and off and on psychotic and not competent." However, while he diagnosed defendant as having an antisocial personality disorder, Dr. Badgley found no evidence of schizophrenia. Defendant did not "appear psychotic in any way during [the] examination."

In Dr. Badgley's opinion, there were two explanations other than schizophrenia for defendant's apparent psychotic behavior in the past. First, when defendant was accused of being mentally ill or psychotic, "he got to the point where he was saying you are accusing me of it, I'll just be that way." Along these lines, Dr. Badgley saw defendant as "rather dramatic and attention-seeking, and in a bizarre way, you might say, playful, and I think he was getting the best of his captors, in a sense, and was able to con them into thinking that he was psychotic." "[I]t gave him control of a situation and it gave him attention . . . ." Second, while Dr. Badgley was doubtful this was the explanation for the psychotic elements perceived in the past by others, he noted defendant had a "considerable history of drug usage, and a lot of the abusive substances are mind-altering and are associated with brief psychosis."

While there was evidence from defendant's MRI that he had an "arach-noid" cyst, such a cyst never affects a person's mental processes or thinking. It can in extremely rare cases cause a block in the cerebrospinal fluid system, so that pressure would build up and lead to paralysis and coma. "But the cyst, itself, does not disturb mental processes." The report on defendant's MRI stated there was "no evidence of change in pressure or increased pressure" on the cerebrospinal fluid system from the cyst. In the absence of pressure, "there is no way" the cyst can affect the way a person is thinking or the operation of the brain.

The report on defendant's BEAM test did not state the test revealed any abnormal electrical activity. In Dr. Badgley's opinion, after examining defendant and reviewing his medical records, MRI result, and BEAM test result, there was no evidence defendant suffered from any form of organic brain damage. It was conceivable very detailed microscopic neuropsychological testing might reveal some abnormality given defendant's history of drug abuse, but it "wouldn't reflect very much in his functioning," that is, it would not mean he could not "reason or think or read and write."

## II. DISCUSSION

### A. *Pretrial*
#### *Alleged* Faretta *Error*

Defendant contends his conviction and death sentence must be reversed because he was denied his right to represent himself, in violation of *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. We conclude defendant never invoked his right to self-representation because his references to such status were equivocal.

#### 1. *Factual Background*

Three hearings are pertinent to this issue, although at the first hearing, defendant did not mention in propria persona status.

On March 26, 1991, a hearing was held before Judge Wallace on a defense motion to continue the trial date. At the hearing, the trial court informed defendant he had a right to trial within 60 days of the time the indictment was filed, or on the currently scheduled trial date of April 8, 1991. The court stated, "Your attorney has indicated a need for a significant amount of additional time to fully prepare your case for trial, and I'm prepared to grant that continuance. It will require a time waiver on your part. Are you willing to waive your right to be tried within 60 days of the filing of the indictment against you, and agree to the continuance to October 15?" Defendant replied, "No, I'm not." The court said, "All right. Do you understand that you do have a right to an attorney to represent you, and that, of course, means an attorney that is properly prepared to submit to the trier of fact all of the defenses that might be available to you, *and you cannot waive that right in this particular case*, and the right to an attorney means the right to a prepared attorney, and an attorney that can adequately represent you. And so it's important that you consider that in making your determination of whether or not you're willing to waive time. The Court would be inclined, even in [the] absence of a time waiver on your part, to consider a continuance, because of the Court's obligation to provide an attorney, which means prepared counsel, and based on . . . the declaration that's been filed in connection with this

motion, . . . certainly I think the continuance for an additional six months thereafter is well within the realm of reason."

Defendant made a number of statements in response, including expressing the view that the Los Angeles proceedings that led to his six prior murder convictions had been "a fabric of lies." He also expressed the view that it was not "right to be making me wait another six months . . . . Like I got my rights, but the way I look at my rights, they amount to about a pimple on the ass of life right now. I just don't think it's fair that you allow this . . . ."

The trial court stated the validity of the six prior murder convictions was a "key element to this particular lawsuit," and hence counsel needed time to properly prepare. Defendant responded, "Well the speedy trial act, the way I read about it, was a public rights bill, not a defendants' rights bill, has been amended to a defendants' rights bill, hasn't it, since the—." The court reiterated that defendant had a right to be tried within 60 days of the filing of the indictment. "You also have another right. You have a constitutional right to be represented by counsel in this matter, *and in this particular case, it's not a right that you can waive.* Right to counsel doesn't mean the right to have some warm body standing next to you during the course of your trial, it's the right to have a qualified lawyer that is adequately prepared to present all available legal defenses on your behalf, and if it is not possible for the attorney to be prepared within the 60 days, then it becomes necessary for the Court to balance your right to a speedy trial with your right to have prepared counsel represent you in the course of the trial. And that's why I've suggested to you, in [the] absence of the time waiver, the Court is going to— undoubtedly at this point finds good cause to grant the continuance in any event. . . . [I]f you would prefer to go to trial on the 8th, with a warm body that doesn't have the ability to present all the defenses on your behalf and to get witnesses here to do that, that's another story."

Defendant replied, "Well, that's what I prefer, because it doesn't seem like you can do anything more to me. Unless you go back to the old days of swift justice and a PT bullet in the back of the head or some cyclone or whatever. But I just prefer to have this over and done with," describing some discomforts of prison. After further discussion between the court and defendant and the court and counsel, the continuance request was granted.

On September 23, 1991, another hearing was held before Judge Wallace on a defense request to continue the trial date from October 15, 1991, to February 18, 1992. The court inquired of defendant, "Are you prepared to waive time so I can grant your attorneys' request for a continuance?" After confirming Judge Wallace was the same judge who presided at the earlier hearing, defendant said, "You told me last time, over my objection, that my

trial was starting . . . October 15." The court said, "I understand what you're saying. I'm just asking a very simple question, whether you're prepared to waive time." Defendant said, "I wasn't prepared back then; what makes you think I'm prepared right now?" The court replied, "I have no reason to know anything about what you're thinking, sir. And I'll take that to be a no answer, as far as a time waiver is concerned." Defendant said, "It's a no." The court said, "I'll nevertheless find good cause, based on the materials in the motion, that have been submitted. I'll note that while Mr. Danks has a speedy trial right, and we'll do our best to protect that, he also has the right to counsel, which is a constitutional right, which is in this court's view, is . . . paramount . . . to the speedy trial right, and preparation for trial is necessary to have counsel that is prepared. So I'll—." Defendant asked, "*What about going pro. per.?*" The court said, "Well, then, we really have problems having counsel prepared." It then continued the trial, briefly discussed the timing of motion filing with counsel, and the proceeding adjourned.

On February 11, 1992, a hearing was held on a defense discovery motion. At the start of the hearing, defense counsel informed the court defendant wanted to make a *Marsden* motion. (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) The court elected to proceed first with defendant's discovery request. Once this was resolved, defense counsel moved defendant be examined pursuant to section 1368 to determine if he was competent to stand trial. Before addressing that issue, the court heard the *Marsden* motion.

At the 40–45 minute hearing on the *Marsden* motion, defendant complained about the number of continuances his attorneys had sought. He noted in particular the continuance of the preliminary examination had led to an indictment and loss of the opportunity for a preliminary hearing. He also expressed irritation that a trial date continuance had been granted over his objection. The court stated it takes some time for counsel to prepare a case like defendant's, and explained in particular how problems with discovery can cause delay. It then inquired, "So anything else that you are concerned about?"

Defendant said the procedure seemed like a "repeat of Los Angeles. . . . [I]t just seems like I am not going to get a trial here. You know, I come into this courtroom today and the first thing [defense counsel's] talking about is filing a [section] 13[68] on me and having me sent to the looney bin. I don't appreciate that, I don't like that, and I will not stand for that." After further exchange, defendant said, "I want to ask you, Judge, what happens if I just flat out refuse to talk to any doctors, to take any psychological tests, period? What are you going to do? Are you going to resort to some kind of third degree gas at that point or torture tactics to force me to talk to a psychiatrist

when I do not choose to talk to a psychiatrist? *I would like to defend myself in the first place.* Proposition 115, I understand provision of that allows that a jury, you don't have to bring in a jury panel of four, five hundred people and question 'em all through the lawyers and the day questioning. I understand you can drop their names in the hat and the Judge can pick their names of 12 jurors and six alternates out of the, out of a hat. I understand that. Well, that's what I want. I don't feel like going through questioning all them people. *And if I was defending myself, see,* I'm the only one that knows what's going on inside my head and I am going to tell them doctors nothing. I might not even talk to the doctors, period. And what these people are doing, I don't understand what these people are doing, you know, they're going back, going to Michigan and visiting my family, you know. That's all fine and dandy, but you know, they ain't even beginning to scratch the surface of what's, of what's really happening."

The court explained defendant's attorney had a duty to investigate and gather information to prepare for trial. After further exchange, defendant said that if he refused to see the doctors, his attorneys would claim he was refusing to cooperate. He then said he had been "railroaded" into a mental hospital during the earlier Los Angeles murder proceedings, and that even his current counsel felt he had been so "railroaded." Defendant insisted, "I understand what it means to be competent . . . . [I]f I was to . . . hire my own attorney, well, I would be expecting him to be working for me. I wouldn't be expecting him the first thing I do when I come into the courtroom is him telling the Judge that . . . I belong in a looney bin and that I'm nuts. I don't appreciate that. I don't like that. If, if a man was working for me, he would be off the case, . . . he'd be on his way." The trial judge assured defendant he would not grant counsel's section 1368 motion unless he thought it was appropriate, and stated that counsel seemed to be trying to get to know defendant's case as much as possible.

Defendant then asked the court to explain "something" about the charge against him. Before elaborating, he said, "I didn't like that either, he's telling the Court that I'm killing elderly men. I had no idea them bums were old men. I had no idea whatsoever. I mean I didn't just go out and look for an old man. That kinda upset me there, too . . . . But anyway, . . . what exactly is the charge now . . . ." Defendant stated in the absence of the prior murder convictions, there would be no special circumstances. The court said that was why defendant's attorneys were investigating his guilty plea, to see "if there's some way to attack the legality." Defendant responded, "I understand all that. *I've been working with them on that. You know, they think that I'm not working with them on that, but I am working with them on that. They don't realize how much I've been working with 'em on that.*" The court said, "I'm sure they do," and then explained prisons can place limitations on attorneys spending time with their clients. Defendant commented on the difficulty the

prison placed on the attorneys' visits, and said he could not see "that the Department of Corrections has a right to do that. Especially when they've been spending thousands . . . upon thousands upon thousands . . . of dollars to fly out to Michigan . . . *and all the other things that I've been working with 'em with.* See if—I don't know what they've been explaining to this Court, *but I have been working with them,* and I have been . . . approaching them on certain things that is very important, and it's going to cost money. We're talking about subpoenas to bring down material witnesses and things like that. I guess they just don't realize *how much I've been cooperating with 'em.* But—." In response to the court's inquiry, defense counsel then apparently indicated they wished to continue to represent defendant. The court agreed with defendant that the prison had logistical problems. Defendant then said, *"I will work with them. I will try to cooperate with 'em.* I just wanted to make clear for the record that if this were, if the law under that CAT test, if it were the truth, and I understand there's a case back when the San Quentin [S]ix trial was going on when one of the men there went pro. per. in that case and back then they had made a new law where a man has a right to choose, pick and choose his attorney. . . . I don't know if that's true, but according to [a book] in that trial . . . one of 'em was allowed to go pro. per. and one of 'em was allowed to pick and choose his own attorney. Now I don't know if he was forced to pay for that attorney or if it was a state appointed attorney, but according to that, he was allowed to do that. Now the way I figure it is if that, if the CAT, if that CAT law was true, then . . . these people would have an obligation to be fighting for my rights for a speedy trial. . . . I'm still getting time continuances against my wishes. I want to make that clear for the record so that 20 or 30 years from now because . . . the death penalty law is nothing but a joke in the first place, so 20, 30 years from now when I get enough law books and come back and get these records I can come back and say hey, here's an attorney that . . . is supposed to be, according to the law, a real attorney, just like you would go out on the streets and just hire[] any attorney and he is supposed to be fighting for your rights, but look what happened. I didn't get a trial for two or three or four years. *Anyway, I will work with these attorneys . . . ."*

Defendant and the court then engaged in an extended colloquy regarding whether the section 4500 charge would independently support a death verdict even if the prior murder convictions were found invalid. After further colloquy on other matters, defendant said he did not want his defense attorneys "meddling in what happened in Los Angeles because I'm just going to tell you right now bluntly they're incompetent to handle anything that happened in Los Angeles. . . . And I just don't feel it [is] right for them to meddle in my affairs in Los Angeles when the issue right here is Mr. Holt, and . . . I'm not going to take a deal, but . . . I would like to have a jury selected out of a hat and . . . that way I could sit up, wherever I'm going to sit,

I don't know where you sit, and I could tell the jury personally exactly what happened. See I think, Judge, that you fail to realize just exactly what kind of terror Mr. Holt went through in that cell . . . I don't think anybody personally gives a shit what goes on in them prisons or them jails. . . . Nobody understands, I mean, what this victim has went through. The only thing they're concerned about is putting me in a looney bin, and I don't appreciate it one bit. I want a trial. *I want to defend myself and go pro. per. If I'm not allowed to go pro. per.,* I would at least like to be cocounsel to where I could sit there, maybe I could just take the stand and tell 'em, the jury exactly what happened on this incident." Defendant said defense counsel were not going to "lift a finger" to help him seek a monetary remedy for what happened to him in Los Angeles. "So that's why I am objecting to everything they're trying to do about Los Angeles." Defendant then complained about correctional officer misconduct in prison. The court denied the *Marsden* motion and stated it had no doubt regarding defendant's competence to stand trial.[5]

## 2. *Discussion*

When "a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Unlike the right to representation by counsel, the " 'right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se.*' " (*People v. Marshall* (1997) 15 Cal.4th 1, 20–21 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*); *id.* at p. 23 ["[T]he court should draw every reasonable inference against waiver of the right to counsel"]; see *Brewer v. Williams* (1977) 430 U.S. 387, 391, 404 [51 L.Ed.2d 424, 97 S.Ct. 1232] ["courts indulge in every reasonable presumption against waiver" of the postarraignment right to counsel].) "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*People v. Dent* (2003) 30 Cal.4th 213, 218 [132 Cal.Rptr.2d 527, 65 P.3d 1286].)

*Faretta*'s emphasis "on the defendant's knowing, voluntary, unequivocal, and competent invocation of the right suggests that an insincere request or one made under the cloud of emotion may be denied." (*Marshall, supra,* 15 Cal.4th at p. 21.) "[A] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation." (*Marshall,* at p. 21; *id.* at p. 23 ["A motion for self-representation made in passing anger or frustration . . . may be

---

[5] Despite this ruling, the matter was subsequently revisited, and as noted earlier, a competency hearing was held in September 1992. Defendant was found competent to stand trial after this hearing.

denied"]; *Reese v. Nix* (8th Cir. 1991) 942 F.2d 1276, 1281 [the defendant's statement, "Well, I don't want no counsel then," was not a clear and unequivocal invocation of his right to self-representation]; *Jackson v. Ylst* (9th Cir. 1990) 921 F.2d 882, 888–889 [the defendant's statement, " 'I want to fight in pro per then. Relieve him and I do this myself,' " was an "impulsive response to the trial court's denial of his request for substitute counsel," and "did not demonstrate unequivocally that he desired to represent himself"]; *id.* at p. 888 ["trial court properly may deny a request for self-representation that is 'a momentary caprice or the result of thinking out loud' "].)

Here, we conclude that defendant's references to self-representation were equivocal, born primarily of frustration regarding the granting of counsel's requests for continuances and his desire to avoid further psychiatric examination. At the September 23, 1991, hearing, the entire proceeding focused on whether the trial court should grant a continuance, which the court did over defendant's objection. At the end of the hearing defendant said, "What about going pro. per.?" The court, which could observe defendant's demeanor, said, "Well, then, we really have problems having counsel prepared." It then continued the trial and briefly discussed the timing of motion filing with counsel, and the proceeding adjourned. The court's response indicates it did not interpret defendant's remark as a serious request, and defendant made no effort to demonstrate it was such a request.

Defendant concedes it "might be said" that his question, "What about going pro. per.?" "was not an unequivocal invocation of his right to represent himself." He argues, however, "the only reason why [defendant's] request might be considered equivocal is because of the failure of " the court to respond to this question, "particularly considering the fact that Judge Wallace had twice falsely told" defendant at the March 26, 1991, hearing "that he was not permitted to waive counsel." Defendant asserts, "A defendant's constitutional right to represent himself should not be sabotaged by misleading him and failing to take corrective action when he directly asks a question that goes to the misinformation he was given."

Of course, at the March 26, 1991, hearing, defendant never mentioned self-representation. In addition, the court's remarks regarding waiver at that hearing were ambiguous and not elaborated on. Even assuming the trial court was saying defendant could not represent himself in this case, given defendant's reference to going in propria persona at two subsequent hearings, one of which was before the same trial judge who had presided at the March 26, 1991, hearing, defendant apparently did not understand the court's March 26, 1991, remarks as precluding such a possibility.

Nor, contrary to defendant's assertion, were defendant's references to in propria persona status at the February 11, 1992, hearing "clear and unequivocal." The focus of the 40–45 minute hearing was on whether counsel should be replaced because of defendant's dissatisfaction with their efforts to continue the trial and to have him declared incompetent. Defendant made his dissatisfaction with counsel clear, but also repeatedly stated he had and would continue to cooperate with counsel. His fleeting statements about defending himself, embedded in diatribes regarding his opposition to further psychiatric examination and prison conditions, were insufficient to constitute an articulate and unmistakable invocation of the right to self-representation. (See *Marshall, supra,* 15 Cal.4th at p. 21.)

B. *Penalty Phase*[6]

1. *Alleged Juror Misconduct*

Defendant alleges prejudicial juror misconduct in violation of numerous rights under the federal and state Constitutions. (U.S. Const., 1st, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 4, 15, 16 & 17.) Specifically, he contends the misconduct tended to diminish the jurors' sense of responsibility for their penalty decision; substituted a source of law, other than California law as instructed on by the trial judge, for their decision; and violated his right to a reliable penalty determination, the right to a trial by an impartial jury, his confrontation right, and his right to be free of an establishment of religion.

a. *Factual Background*

On February 9, 1993, at 3:20 p.m., the jury returned its penalty verdict.[7] On March 15, 1993, defendant filed a motion for new trial alleging juror misconduct.[8] Defendant contended that during the penalty phase deliberations, two jurors, K.A. and B.P., had consulted outside persons for spiritual

---

[6] Defendant raises no guilt phase issues.

[7] The jury was instructed at the penalty phase, "You must decide all questions of fact in this case from the evidence received in this trial and not have any other source. You must not make any independent investigation of the facts or the law or consider or discuss facts of which there is no evidence. This means, for example, you must not on your own visit the scene, conduct experiments or consult reference works or persons for additional information. You must not discuss this case with any other person . . . except a fellow juror, and you must not discuss the case with a fellow juror until the case is submitted to you for your decision and only when all of you are present in the courtroom."

[8] On March 11, 1993, the original sentencing date, defendant opposed a continuance of his sentencing in order for defense counsel to file the motion for new trial, stating, "I don't care if that broad read the Bible and gave it to every other broad in the jury room, I don't care. . . . I want my sentencing. I want it done today."

guidance, and that certain biblical passages were brought into the jury room. He attached the March 10, 1993, declaration of Juror K.A., which as relevant provided:[9]

*"At some point during the trial I felt stress from being in court all day and attempting to go home at night and do all the home responsibilities in four hours that I normally did in eight hours.* My husband noticed that I was on edge and he told me at that time that it would be permissible to speak with our pastor, and that this was permissible because a pastor is of a higher authority.

"Penalty phase deliberations began on a Friday and the court recessed on Friday afternoon. *I was leaning toward the death penalty but I felt discomfort about imposing the death penalty. If I was going to vote for the death penalty I wanted to feel good about it. I needed to talk to someone out of a need for comfort.* Judge Oberholzer had told us we could not speak with persons about the case. *But because of the feelings I had, I felt the necessity of talking to my husband.* My husband advised that reading scripture from the Bible might be of benefit to me. He showed me the Book of Numbers, [c]hapter 35, [v]erses 16 through 25 and 30 through 31, which is at pages 306 and 307 from my 'The NIV Study Bible.'[10]

"On Sunday evening, when we were at the [c]hurch [f]acility for Bible study, we met the pastor. That is where my husband made a copy of pages

---

[9] We have italicized those portions of the declarations that relate solely to the mental processes and subjective reasoning of the declarant juror and hence cannot be considered (*People v. Hutchinson* (1969) 71 Cal.2d 342, 349–350 [78 Cal.Rptr. 196, 455 P.2d 132] (*Hutchinson*)), or which are irrelevant to any pending issue.

[10] As provided in the attachments to the juror's and defense counsel's declarations, these verses provide: "If a man strikes someone with an iron object so that he dies, he is a murderer; the murderer shall be put to death. Or if anyone has a stone in his hand that could kill, and he strikes someone so that he dies, he is a murderer; the murderer shall be put to death. Or if anyone has a wooden object in his hand that could kill, and he hits someone so that he dies, he is a murderer; the murderer shall be put to death. The avenger of blood shall put the murderer to death; when he meets him, he shall put him to death. If anyone with malice aforethought shoves another or throws something at him intentionally so that he dies or if in hostility he hits him with his fist so that he dies, that person shall be put to death; he is a murderer. The avenger of blood shall put the murderer to death when he meets him. [¶] But if without hostility someone suddenly shoves another or throws something at him unintentionally or, without seeing him, drops a stone on him that could kill, and he dies, then since he was not his enemy and he did not intend to harm him, the assembly must judge between him and the avenger of blood according to these regulations. The assembly must protect the one accused of murder from the avenger of blood and send him back to the city of refuge to which he fled. He must stay there until the death of the high priest, who was anointed with the holy oil. . . . [¶] . . . [¶] . . . Anyone who kills a person is to be put to death as a murderer only on the testimony of witnesses. But no one is to be put to death on the testimony of only one witness. [¶] Do not accept a ransom for the life of a murderer, who deserves to die. He must surely be put to death."

306 and 307 from our Bible containing the Book of Numbers verses. In a brief meeting with the pastor, who knew that I was a juror on the Danks case, my husband said to me that this might be a good time for me to discuss my feelings ab[o]ut the trial verdict. I told the pastor that I had read the scripture and it gave me comfort. The pastor said those were good scriptures and then jokingly said that he would impose the death penalty on Mr. Danks.

"On Monday, I returned to court for deliberations. I took the copy of the pages from the Book of Numbers with me. I had highlighted certain portions of that.

"During deliberations, other jurors expressed feelings about the difficulty and responsibility of making a life or death decision. I told the other jurors about my copy of the pages from the Book of Numbers. I then shared it with the other jurors by passing it around to the other jurors. I recall one juror being offended that I had the scripture, because later in the day that juror said words to the effect that [G]od does not play a part in this decision, which I assumed was referring to our Christian beliefs being discussed during deliberations.

"I no longer have that copy.

"Juror [B.P.] told me that she had talked to her pastor and he had referred her to the same chapter and verses in the Book of Numbers.

"On March 9, 1993, I was contacted by [defense investigator] Mrs. Pat McGregor and I told her how I had consulted the Bible. The next day, I met with Mrs. McGregor and [defense counsel] Mr. Eyherabide on the same subject. I took my Bible with me and Mr. Eyherabide copied pages . . . 306 and 307 and asked me to highlight those portions which I had highlighted on the copy passed in the jury room. I did highlight those portions in red and pink ink and Mr. Eyherabide indicated he would attach that copy to this statement."

Defendant also attached the declaration of Mr. Eyherabide, which discussed defense efforts to obtain a declaration from Juror B.P., and attached unhighlighted copies of the Book of Numbers pages for purposes of legibility.

The People opposed the motion for new trial. Defendant then filed two supplemental declarations. The first, a March 15, 1993, declaration by Juror E.M., stated in relevant part, "During the penalty phase deliberat[i]ons in the [Danks] case, [J]uror [B.P.] told me that she had talked to her pastor for guidance on the case." The second was a March 16, 1993, declaration by Juror B.P. As relevant it provided:

"During the penalty phase deliberations I spoke to my pastor. *By that time, I had already made my decision. However* I wanted to know what the Bible said about the death penalty. My pastor stated "[B.], I think I know what case you are on. There is no place in the Bible that takes the law out of the Bible. If you are sitting on the case I'm thinking you are sitting on, if I was in your shoes, I would not hesitate to give him the death penalty.

*"My reasons for voting for the death penalty were these: based on the evidence of Mr. Danks' past life and what his future life in prison [would be], he didn't have much to live for; Mr. Danks wanted the death penalty; and because other persons could not be safe around Mr. Danks."*

Mr. Eyherabide also filed a second declaration describing the circumstances under which the defense obtained Juror B.P.'s declaration.

The People then filed a supplemental points and authorities in opposition to the motion for new trial. Attached to the opposition were second declarations by Jurors K.A. and B.P., both executed on March 30, 1993. Juror K.A.'s second declaration, as relevant, provided:

"After the first day of penalty phase deliberations, which was a Friday, *I felt a great deal of stress and was upset, both due to the stress of making a decision in the case, and due to the difficulty of completing my normal home responsibilities in the evening after a full day in court.* My husband noticed that I was upset, and showed me a passage in the Bible *which gave me comfort.* I did not discuss the case or our deliberations with him, but simply the stress I felt in making the decision.

"On Sunday evening, I picked my husband up at church for Bible Study, and encountered our pastor. My husband at that time stated to me that at this time I might be able to talk with our pastor about the Bible verses that I had read.

"I said that I did not need to discuss anything. My pastor said he understood that I had read several scripture vers[e]s. I told him that I had read the scriptures and they gave me comfort. The pastor then stated in a joking manner that if he were a juror he would impose the death penalty on Mr. Danks.

"On Monday, I returned to court for deliberations. I took the copy of the pages from the Book of Numbers with me. During the deliberations, other jurors expressed the feeling that it was difficult having the responsibility for making a life and death decision. I told the jurors about my copy of the pages from the Book of Numbers, and how that passage had given me comfort. I

then passed it around to the other jurors. At no time did I or anyone else argue or state that Mr. Danks should be put to death because of what that passage of the Bible said. I do recall one juror later stating that God does not play a part in our deliberations."

Juror B.P.'s second declaration, as relevant, was as follows:

"On the first day of penalty phase deliberations, which was a Friday, three votes were taken on the penalty. I voted the same way on all three occasions.

*"At the end of the day, I had made up my mind as to what I personally thought was the appropriate penalty. However, I felt a great deal of emotional turmoil due to the seriousness of making a life or death decision.* After the first day of deliberations, I spoke with my pastor about the difficulty of making the decision. I told him, 'Pastor, I'm doing jury duty on a murder case. Is there anything in the Bible which speaks against the death penalty?' I also told him that I had made up my mind about the verdict.

"In response, my pastor told me, '[B.], I think I know what case you are on. There is no place in the Bible that takes the law out of the Bible. If you are sitting on the case I'm thinking you are sitting on, if I was in your shoes, I would not hesitate to give him the death penalty.'

"On Monday and Tuesday, when deliberations resumed, several additional votes were taken. On all occasions I voted for the same verdict as I had previously. At no time during the deliberations did I relate to the other jurors what my pastor had said to me, nor did I argue or state that the death penalty should be imposed because of anything said in the Bible."

The trial court denied the motion for new trial. Defendant never sought a *Hedgecock* hearing. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*).)

b. *Discussion*

1) *What portions of the declarations are admissible?*

In order to determine whether there was juror misconduct and if so, prejudice, we first consider what portions of the declarations are admissible. Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the

effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225].) " 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*Steele*, at p. 1261.)

Here, certain portions of the declarations, which have been italicized, relate solely to the mental processes and subjective reasoning of the declarant juror regarding the penalty deliberations, and hence cannot be considered. Other portions, which have also been italicized, involve mental processes or subjective reasoning that while not directly related to the penalty deliberations, are irrelevant to any issue we are considering. Thus, we may not consider why Juror K.A. was experiencing stress, or what verdict she was leaning toward. Nor may we consider the reasons Juror B.P. voted for the death penalty. (See *Hedgecock*, *supra*, 51 Cal.3d at p. 419 ["when a juror in the course of deliberations gives *the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes.* Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150"].)

### 2) *Applicable law for determining any misconduct and prejudice*

We first determine whether there was any misconduct."Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 295 [84 Cal.Rptr.2d 403, 975 P.2d 600].) However, "[t]he introduction of much of what might strictly be labeled 'extraneous law' cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses; it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' (*Rideau v. Louisiana* (1963) 373 U.S. 723, 733 [10 L.Ed.2d 663, 83

S.Ct. 1417] (dis. opn. of Clark, J.).) Moreover, under that 'standard' few verdicts would be proof against challenge." (*People v. Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].) "The safeguards of juror impartiality . . . are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (*Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 102 S.Ct. 940].)

If we conclude there was misconduct, we then consider whether the misconduct was prejudicial. This standard is well established. "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter*).)

"First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror." (*Carpenter, supra,* 9 Cal.4th at p. 653.) "Under this standard, a finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information." (*Ibid.*)

Second, "even if the extraneous information was not so prejudicial, in and of itself, as to cause 'inherent' bias under the first test," the nature of the misconduct and the "totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose." (*Carpenter, supra,* 9 Cal.4th at pp. 653–654.) "Under this second, or 'circumstantial,' test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. 'The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual' " bias. (*Id.* at p. 654.)

"The judgment must be set aside if the court finds prejudice under either test." (*Carpenter, supra,* 9 Cal.4th at p. 653.) "Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] (*Nesler*) (lead opn. of

George, C. J.).) However, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*Ibid.*)

"We emphasize that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial* . . . . [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. (*People v. Marshall, supra,* 50 Cal.3d at p. 950.) Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*Carpenter, supra,* 9 Cal.4th at pp. 654–655.)

### 3) *Application of the law to these facts*

Disregarding the italicized portions of the juror declarations, we now consider whether any misconduct occurred, and if so, whether that misconduct was prejudicial. We conclude that the unsolicited comments from Juror K.A.'s pastor, Juror B.P.'s conversation with her pastor, and the introduction of the Bible passages to the jury room were misconduct, but that this misconduct was not prejudicial.

We begin with Juror K.A.'s conversations with her husband and her reading the Bible. Juror K.A.'s husband noticed she was on edge and told her it would be permissible for her to speak to her pastor because a pastor is a person of higher authority. Juror K.A. did not discuss the case or the deliberations with her husband, but only the stress she felt in making the decision. Her husband advised that reading scripture from the Bible might be of benefit to her, and showed her the Book of Numbers, chapter 35, verses 16 through 25 and 30 through 31.

█ It is misconduct for a juror during the course of trial to discuss the case with a nonjuror. (*People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) Here, however, Juror K.A. did not discuss the case or deliberations with her husband, but only the stress she was feeling in making the decision. That is not misconduct.

As for Juror K.A.'s reading the Bible during deliberations, defendant concedes a juror may read Bible passages in the privacy of her home without committing misconduct. He notes, "An inquiry into whether a juror privately studied his/her Bible at home during the time when their jury was deliberating would involve a degree of intrusion that our society would deem beyond the permissible . . . ." Even if Juror K.A.'s reading of the Bible passages given to her by her husband was misconduct, we conclude it was not prejudicial.

"[A] finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment." (*Carpenter, supra*, 9 Cal.4th at p. 653.) Moreover, we do not reverse unanimous verdicts because there is *some* possibility the juror was improperly influenced. Rather, the likelihood of bias under the inherent prejudice test "must be *substantial*." (*Id.* at p. 654.) "Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information." (*Id.* at p. 653.)

 Objectively considering the Book of Numbers passage in light of the compelling penalty phase evidence in this case, we conclude the passage was not inherently and substantially likely to influence, i.e., bias Juror K.A.

Defendant was convicted of the premeditated murder of his sleeping cellmate. In his statement to police, defendant implied that he had killed Mr. Holt in order to receive the death penalty. Defendant had suffered six prior first degree murder convictions. All of the victims were strangers to defendant, and he indicated to police the stabbings were unimportant because the victims were "bums." While defendant was incarcerated, he committed two other stabbings, and expressed frustration he had failed to kill one of these victims. He also fashioned and concealed several sharp weapons. During his penalty phase testimony, defendant expressed no remorse for his crimes, stating, "I would not change a thing that I did in my life." He also strongly implied he would continue to be violent in a controlled setting, and apparently threatened the jury.

While defendant introduced evidence he was schizophrenic, that evidence was not only disputed, but according to defendant's own medical experts, a significant aspect of this mental illness was that defendant derived great sadistic pleasure in attacking other people. Dr. Bittle testified that defendant "is a sadist . . . . [W]hen I asked [defendant] to describe his feelings about the murders in Los Angeles, [he] became sexually excited. That is one of the motivations for Mr. Danks' behavior." Dr. Hill testified that defendant had "a delusional self-concept that . . . he is righteously performing murders or harming people[,] something that he also enjoys greatly." Moreover, even if defendant cooperated with his medication regimen, which he had on occasion refused to do in the past, he remained, as Dr. Hill testified, "an extraordinarily dangerous individual regardless of whatever level of psychiatric improvement he may have." Similarly, Dr. Bittle testified that even in a treated and improved condition, defendant "is an extremely dangerous individual."

In addition, there was no guarantee that defendant would not ultimately be returned to the general prison population if the jury imposed a sentence of

life imprisonment without the possibility of parole. Such a possibility posed a continuing threat to the safety of prison personnel and other inmates. Indeed, even if defendant spent the rest of his life in solitary confinement, he was still a threat to prison personnel who for any reason needed to come into contact with him, for example, medical personnel who might be required to involuntarily medicate him. Weighing this penalty phase evidence against the exposure of Juror K.A. to the Book of Numbers passage, it does not appear "the extraneous material, judged objectively, [was] inherently and substantially likely to have influenced" or biased Juror K.A. (*Carpenter, supra,* 9 Cal.4th at p. 653.)

Having concluded the Book of Numbers passage was not inherently prejudicial, we now consider "the nature of the misconduct and the surrounding circumstances" to determine whether it is substantially likely Juror K.A. was nevertheless actually biased as a result of reading this passage. (*Nesler, supra,* 16 Cal.4th at p. 579.)

As noted above, defendant concedes a juror may read the Bible in the privacy of her home without committing misconduct. Thus, he implicitly also concedes he suffered no actual bias as a result of Juror K.A.'s reading the relevant passage. Moreover, while Juror K.A. later shared this Bible passage with her fellow jurors, "[a]t no time did [she] or anyone else argue or state that Mr. Danks should be put to death because of what that passage of the Bible said." Finally, consideration of the significant penalty phase evidence further diminishes the possibility defendant suffered actual bias as a result of Juror K.A.'s reading the Bible.

We next consider Juror K.A.'s conversation with her pastor.[11] At church on Sunday evening, she encountered her pastor. Her pastor knew she was a juror in defendant's case. Juror K.A.'s husband said this might be a good time to talk to the pastor either about the Bible verses she had read or her feelings about the verdict. She said she did not need to discuss anything. The pastor said that he understood she had read several scripture verses. Juror K.A. said that she had read the scriptures and they gave her comfort. The pastor said those were good scriptures and jokingly said that if he were a juror, he would impose the death penalty on defendant.

---

[11] It is troubling that during deliberations not one but two jurors had conversations with their pastors that ultimately addressed the issue being resolved at the penalty phase in this case. Because jurors instructed not to speak to anyone about the case except a fellow juror during deliberations (CALJIC Nos. 0.50, 1.03) may assume such an instruction does not apply to confidential relationships, we recommend the jury be expressly instructed that they may not speak to anyone about the case, except a fellow juror during deliberations, and that this includes, but is not limited to, spouses, spiritual leaders or advisers, or therapists. Moreover, the jurors should also be instructed that if anyone, other than a fellow juror during deliberations, tells a juror his or her view of the evidence in the case, the juror should report that conversation immediately to the court.

It is misconduct for a juror during the course of trial to discuss a case with a nonjuror. Here, Juror K.A. told her pastor she did not need to discuss anything with him, and mentioned that the scripture passages had given her comfort. While these statements may or may not be misconduct, more critically, her pastor responded thatthose were good scriptures and jokingly said that if he were a juror, he would impose the death penalty on defendant.

We have previously held that "a juror's inadvertent receipt of information that [has] not been presented in court falls within the general category of 'juror misconduct.' " (*Nesler, supra,* 16 Cal.4th at p. 579.) "Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut." (*Ibid.*)

Assuming Juror K.A.'s conversation with her pastor, and in particular her pastor's response, was misconduct, we conclude it was not prejudicial. In light of the extraordinary penalty phase evidence, the conversation as a whole, and the pastor's gratuitous personal view of the appropriate penalty in particular, judged objectively, were not inherently and substantially likely to have influenced, i.e., biased, Juror K.A.

Nor is it substantially likely Juror K.A. was actually biased against defendant as a result of this conversation. We consider the nature of the misconduct, the surrounding circumstances, and the penalty phase record. (*Carpenter, supra,* 9 Cal.4th at pp. 653–654.) Juror K.A. told her pastor she had nothing to talk to him about, and he nevertheless insisted on imparting his personal, unsolicited view regarding the appropriate penalty verdict. The conversation then apparently ended, at least on this subject. Thus, unlike *Nesler,* where the juror upon inadvertently hearing a diatribe about the defendant did not leave the area, but continued to listen for a half-hour, here the pastor stopped talking immediately and Juror K.A. did nothing to continue the conversation. (*Nesler, supra,* 16 Cal.4th at p. 572.) Moreover, again unlike *Nesler,* there is no evidence Juror K.A. repeated the pastor's comment in the jury room. (*Id.* at pp. 573–574, 579.) Thus, the juror's conduct and the surrounding circumstances fail to demonstrate actual bias. Moreover, the significant penalty record in this case further diminishes the possibility Juror K.A. became actually biased against defendant because of her pastor's comment.

Defendant argues that Juror K.A. and her husband "understood that her talking with her minister was in violation of the trial court's order not to

discuss the case, and that they justified what [Juror K.A.] was about to do by subordinating the law given by the trial court to what they perceived to be divine law." Of course, it was Juror K.A.'s *husband* who said it "would be permissible to speak with [their] pastor, and that this was permissible because a pastor is of a higher authority." As noted above, Juror K.A. told her pastor she did not need to discuss anything.

We next consider Juror K.A.'s conduct in bringing a copy of the Book of Numbers passage into the jury room, and passing it around to the other jurors. This was misconduct. (*People v. Mincey* (1992) 2 Cal.4th 408, 465–467 [6 Cal.Rptr.2d 822, 827 P.2d 388].) However, just as in Juror K.A.'s private reading of the Book of Numbers, nothing in these verses, viewed objectively and in the context of the compelling penalty phase evidence, was inherently and substantially likely to influence, i.e., bias the jurors. Indeed here, one juror specifically commented that God played no role in the penalty decision.[12]

Nor do we conclude Juror K.A.'s misconduct in sharing the Bible passages with her fellow jurors demonstrated either the substantial likelihood of her actual bias, or that it is substantially likely it resulted in the actual bias of other jurors. We emphasize that unlike the juror in *Nesler*, Juror K.A. did not repeatedly refer to this extrajudicial information "despite admonitions from other jurors not to do so." (*Nesler, supra,* 16 Cal.4th at p. 588; *id.* at p. 589 [66 Cal.Rptr.2d 454, 941 P.2d 87].) Juror K.A. "merely shared [her] personal view and did not purport to validate it as truth or impose [her] view on others." (*People v. Lewis* (2001) 26 Cal.4th 334, 391 [110 Cal.Rptr.2d 272, 28 P.3d 34] (*Lewis*).) Indeed, there is no evidence that after the copy circulated the passages were even discussed, other than perhaps one juror's comment that God did not have a role in the jury's decision. While "Christian beliefs" were at some point discussed, we have no information as to what that conversation entailed. Moreover, we have previously observed that it is to be expected and is not misconduct that

---

[12] Defendant argues the following statements from Juror K.A.'s second declaration violate Evidence Code section 1150 and cannot be considered because they are not evidence of misconduct, citing *People v. Cleveland* (2001) 25 Cal.4th 466, 484 [106 Cal.Rptr.2d 313, 21 P.3d 1225] ("statements made by jurors during deliberations are admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct' "): "At no time did I or anyone else argue or state that Mr. Danks should be put to death because of what that passage of the Bible said. I do recall one juror later stating that God does not play a part in our deliberations."

Defendant is correct that these statements do not demonstrate misconduct. However, Juror K.A.'s conduct in bringing Bible passages into the jury room was misconduct. (*People v. Mincey, supra,* 2 Cal.4th at pp. 465–467.) In that situation, we have evaluated the comments of the juror in question and other jurors to determine whether there is evidence of actual bias. (*Nesler, supra,* 16 Cal.4th at p. 588 [The juror "during deliberations made reference to extrajudicial evidence despite admonitions from other jurors not to do so"].) We see no reason why we cannot also consider such comments to determine whether the material was inherently prejudicial.

"jurors . . . consider their religious beliefs during penalty deliberations." (*Lewis*, at p. 389.) Consideration of the significant penalty phase evidence further diminishes the possibility defendant suffered actual bias resulting from juror exposure to these passages.

We next consider Juror B.P.'s conversation with her pastor during the penalty deliberations. Juror B.P. told her pastor she was a juror on a murder case, and asked, "Is there anything in the Bible which speaks against the death penalty?" She also told him she had made up her mind about the verdict. Her pastor stated, "[B.], I think I know what case you are on. There is no place in the Bible that takes the law out of the Bible. If you are sitting on the case I'm thinking you are sitting on, if I was in your shoes, I would not hesitate to give him the death penalty." When Juror B.P. returned to deliberations, on all occasions she voted for the same verdict as she had three times on Friday. At no time during the deliberations did she relate to the other jurors what her pastor had said, or argue or state that the death penalty should be imposed because of anything said in the Bible.[13]

As noted above, it is misconduct for a juror to discuss a case with a nonjuror. Here, Juror B.P. asked her pastor about the Bible's stand on the very issue she was deliberating. Thus, her misconduct was more egregious than that of Juror K.A. We nevertheless conclude this misconduct was not prejudicial.

Viewed objectively in light of the compelling penalty phase evidence in this case, Juror B.P.'s conversation with her pastor, and in particular, unsolic-.ited information that Juror B.P.'s pastor would vote for the death penalty in a case he thought Juror B.P. was sitting on, was not inherently and substantially likely to influence her.

Nor does the record demonstrate a substantial likelihood Juror B.P. was actually biased against defendant as a result of this conversation. Juror B.P. had already voted three times for the death penalty on Friday, and made up her mind, presumably after an impartial consideration of the evidence and

---

[13] While in her first, but not her second, declaration Juror K.A. stated Juror B.P. told her "that she had talked to her pastor and he had referred her to the same chapter and verses in the Book of Numbers," this information does not appear in either of Juror B.P.'s declarations. Nor did the trial court allude to this statement in its ruling. (See *Nesler, supra*, 16 Cal.4th at p. 582.) Moreover, we have no idea when this conversation occurred. The reference in Juror K.A.'s first declaration appears after she had already finished talking about the introduction of the Bible passages into the jury room, and before she mentioned that on March 9, 1993, *a month after the penalty verdict was returned*, she was contacted by a defense investigator. Indeed, Juror B.P. specifically stated, "At no time during the deliberations did I relate to the other jurors what my pastor had said to me." There is no indication in the jurors' declarations that they were anything but forthcoming.

application of the law before her, as to the appropriate penalty in this case.[14] Her general inquiry to her pastor was to determine not whether her vote was correct, but whether it violated a religious proscription. Moreover, her pastor's personal view of the appropriate penalty in the case he thought Juror B.P. was sitting on was unsolicited. As in the case of Juror K.A., and unlike the situation in *Nesler*, Juror B.P.'s conversation with her pastor apparently ended at this point, at least on this subject. Also, like Juror K.A., and again unlike the situation in *Nesler*, Juror B.P. did not discuss the content of her conversation in the jury room. Thus, the juror's conduct and the surrounding circumstances fail to demonstrate a substantial likelihood of actual bias. Finally, the penalty record in this case further diminishes the possibility defendant suffered actual bias as a result of Juror B.P.'s conversation with her pastor.

Thus, with respect to each individual matter, and viewing these matters collectively, we conclude the presumption of prejudice arising from the misconduct was rebutted, and there was no prejudicial misconduct. Having found no prejudicial juror misconduct, we conclude defendant's state and federal constitutional rights to an impartial jury and reliable penalty verdict were not violated. Nor under the circumstances of this case do we conclude that defendant's right to confrontation, or to the extent it is even implicated, his right to be free of an establishment of religion, were violated. We further reject defendant's other arguments on this issue, and in particular his argument that the jurors' sense of responsibility for their penalty decision was diminished, and that they substituted a source of law, other than California law as instructed by the trial judge, for the determination of the penalty. After exhaustive appellate review, we have concluded there is no substantial likelihood either that the Bible passages or the conversations with the pastors were inherently prejudicial or that they resulted in any juror's actual bias. In particular, no objective evidence in the record demonstrates a substantial likelihood any juror felt he or she had less of a weighty responsibility of making a penalty determination after these events occurred. While this case involves religious beliefs, an intensely private area, we are unwilling to ascribe to any perceived stereotype that jurors who receive advice from

---

[14] Defendant contends we may not consider Juror B.P.'s statements that she consistently had the same penalty vote, and that she told her pastor she had made up her mind about the verdict. The import of these statements, he contends, "was to show that Juror [B.P.] had voted for death both before and after she committed her act of misconduct, thereby purportedly showing that her misconduct had no" effect on her. Juror B.P.'s vote and statement to her pastor were objective acts subject to corroboration. (See *Hutchinson, supra,* 71 Cal.2d at p. 350.) While defendant is correct that we cannot consider the fact that Juror B.P. voted for the death penalty after her conversation with her pastor as evidence the misconduct had no effect on her, we may, as we did in *Nesler,* consider the objective acts and statements of the subject juror, such as her three votes before the conversation with her pastor, the statement to her pastor she had already made up her mind, and the other circumstances delineated above regarding this conversation and Juror B.P.'s subsequent conduct, to determine whether there is a substantial likelihood she was actually biased as a result of the conversation. (*Nesler, supra,* 16 Cal.4th at p. 588.)

Christian spiritual leaders, or are exposed to Biblical passages, per se suffer a diminished sense of responsibility for their penalty verdict, and are automatically rendered incapable of fairly evaluating the evidence and law before them.

Moreover, although we have found misconduct, albeit nonprejudicial, in certain instances above, we reiterate that nothing in our opinion is intended to convey that a juror's consideration of personal religious, philosophical, or secular normative values is improper during penalty deliberations. (See *Lewis, supra,* 26 Cal.4th at pp. 389–390.) As we have repeatedly stated, the task of jurors at the penalty phase is qualitatively different from that at the guilt phase. At the penalty phase, jurors are asked to make a normative determination—one which necessarily includes moral and ethical considerations—designed to reflect community values. (See, e.g., *People v. Prieto* (2003) 30 Cal.4th 226, 263, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) " 'The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen.' " (*Lewis,* at pp. 389–390; *cf. People v. Sandoval* (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862] ["We do not mean to rule out all reference to religion or religious figures so long as the reference does not purport to be a religious law or commandment"].) As one author has noted, "the discretion given to a jury to extend or withhold mercy . . . will never produce 'a wholly rational, calculated, and logical process' . . . . [D]eterminations of the appropriate punishment involve factors which are not only 'too intangible to write into a statute' but are also too abstract for a jury to rely on independent of their personal values." (Note, *Thou Shalt Not Quote the Bible: Determining the Propriety of Attorney Use of Religious Philosophy and Themes in Oral Arguments* (1998–1999) 33 Ga. L.Rev. 1113, 1176.)

In concluding Jurors K.A. and B.P. were actually biased, Justice Moreno's concurring and dissenting opinion is unable to marshal objective evidence demonstrating a substantial likelihood of such bias, but instead relies on misstatements of the record and speculation to reach its conclusion. In particular, there is no evidence Jurors K.A. and B.P. "took the extraordinary step of discussing their possible death verdict with their pastors." (Conc. & dis. opn. of Moreno, J., *post,* at p. 323.) Rather, Juror K.A. states she told her pastor she "did not need to discuss anything." Juror B.P. told her pastor she "had made up [her] mind about the verdict," and simply wanted to know if there was "anything in the Bible which speaks against the death penalty."

Nor does Juror K.A.'s declaration include any evidence, even inadmissible evidence, she "discussed the case first with her husband." (Conc. & dis. opn. of Moreno, J., *post,* at p. 327; *id.* at p. 328 [Juror K.A. " 'felt the necessity' of talking to her husband about the case"].) Rather, Juror K.A. states, "I did not

discuss the case or our deliberations with [my husband], but simply the stress I felt in making the decision."

Justice Moreno's concurring and dissenting opinion asserts that "B.P. candidly acknowledged that she spoke with her pastor about 'the difficulty of making the decision.' Her pastor then told her that he 'would not hesitate' to give defendant the death penalty. The damage was done. Juror E.M. stated that, after this meeting, and '[d]uring the penalty phase deliberat[i]ons in the [Danks] case, [B.P.] told me that she had talked to her pastor for guidance on the case.' Simply stated, if B.P. had been certain of her verdict, she would not have asked her pastor for guidance in making this difficult decision." (Conc. & dis. opn. of Moreno, J., *post*, at p. 329.)

Juror E.M.'s single-sentence statement fails to place the reported conversation into any meaningful context. Nevertheless, we know from Juror B.P.'s declaration what she meant by "guidance." When that declaration is read as a whole, it is apparent that while Juror B.P. acknowledged the difficulty of making the penalty decision, she told her pastor she had already done so. What she sought "guidance" regarding was whether anything in the Bible spoke against the death penalty. Justice Moreno's concurring and dissenting opinion conveniently omits this portion of Juror B.P.'s declaration, and conflates the sentences to make it improperly appear that the pastor's comment was not unsolicited, which it was, but was in response to an inquiry by Juror B.P. about which penalty decision she should make. Moreover, contrary to the manner in which the conversation is portrayed by both concurring and dissenting opinions, the pastor further stated he was not certain what case B.P. was serving as a juror on. (Conc. & dis. opn. of Kennard, J., *post*, at p. 319; conc. & dis. opn. of Moreno, J., *post*, at p. 329.)

Justice Moreno's concurring and dissenting opinion notes, in concluding Juror B.P. was actually biased, that while Juror B.P. did not discuss the content of her conversation with her pastor with fellow jurors, she did, as noted above, reportedly tell Juror E.M. that "she had asked her pastor for guidance." (Conc. & dis. opn. of Moreno, J., *post*, at p. 329, fn. 5.) From this, Justice Moreno concludes, "Thus, even if B.P. did not relate to other jurors the specifics of that conversation, she apparently did not hesitate to make the jury aware that such a conversation took place." (*Ibid.*) Justice Moreno later states, "B.P. also informed other jurors during deliberations that her pastor offered her guidance on this difficult decision." (*Id.* at p. 332.)

Contrary to Justice Moreno's concurring and dissenting opinion's assertion, there is no evidence "B.P. . . . informed other jurors during deliberations that her pastor offered her guidance on [the penalty] decision." (Conc. & dis. opn. of Moreno, J., *post*, at p. 332.) Rather, as noted above, we know from Juror B.P.'s declaration what "guidance" she is referring to, i.e., whether the death penalty violated a religious proscription. That inquiry does not demonstrate

actual bias. Nor could her mention of the fact of this conversation in the jury room, without more, demonstrate her actual bias.

Justice Moreno's concurring and dissenting opinion relies on the fact that Christian beliefs "were discussed during . . . deliberations." (Conc. & dis. opn. of Moreno, J., *post*, at p. 333; *id.* at p. 335.) We are not given any information as to what this discussion entailed, and there appears to be no basis to conclude the discussion was improper. (*Carpenter*, *supra*, 9 Cal.4th at p. 657 ["We will not presume greater misconduct than the evidence shows"].) Indeed, Juror K.A. specifically stated that "[a]t no time did I or anyone else argue or state that Mr. Danks should be put to death because of what that passage of the Bible said," and Juror B.P. stated, "At no time during the deliberations . . . did I argue or state that the death penalty should be imposed because of anything said in the Bible." Most important, as set forth at length above, and contrary to the strong implication of Justice Moreno's concurring and dissenting opinion, there is nothing improper with a penalty jury's discussing normative beliefs in reaching a penalty decision.

### 2. *Alleged* Miranda *Violation*

Defendant contends his judgment of death must be reversed because the trial court erroneously admitted his 1987 statement to police concerning the earlier murders. He contends the police violated his *Miranda* rights in obtaining this statement by ignoring his invocation of the right to counsel. Defendant does not attack the validity of his six prior murder convictions. Rather, he contends that without this statement, "none of the evidence concerning the stabbing of derelicts in Los Angeles would have been admissible, since none of it would have connected [defendant] with the stabbings." However, defendant apparently concedes some such evidence would have been admissible, since he also contends that absent his statement, the jury in this case would have only received a minute order "stat[ing] the bare fact of the" six prior murder convictions, "with no description of the underlying facts and not even anything to connect the conviction[s] with the stabbings of derelicts described by witnesses. The jury may not even have realized that the evidence of the stabbings referred to by witnesses pertained to the same murders as the 1990 conviction." Defendant also contends that absent his statement, the jury would not have heard his "callous" remark, "It ain't nothing, man, three or four bums. I don't see what the big fucking deal is, what the big fucking deal is, man."

■ Assuming defendant can at this point attack his 1987 statement in an unrelated crime that is being used in this case solely for penalty phase evidence purposes, any error was harmless beyond a reasonable doubt. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1037 [60 Cal.Rptr.2d 225, 929 P.2d 544] (*Bradford*).) Significantly, defendant does not challenge the validity of his six prior murder convictions, and at the penalty phase the prosecution

was entitled to delineate the circumstances underlying those convictions. (*People v. Stanley* (1995) 10 Cal.4th 764, 818 [42 Cal.Rptr.2d 543, 897 P.2d 481] [this court has repeatedly rejected the contention that only the fact of the prior conviction is admissible, not the details of the offense]; *People v. Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189].) Moreover, during his penalty phase testimony, defendant stated, "I did stab them bums in their back, in the back of their neck, in their side while they were laying down, while they were asleep . . . ." In addition, the witnesses describing the stabbings, and documentary evidence such as death certificates, indicated all but one of the victims were dead, and defendant's own witnesses noted defendant called himself a "bum buster" and repeatedly maintained the people he had stabbed and allegedly killed were not dead. Thus, even without defendant's 1987 statement, the jury could not have failed to link defendant's prior murder convictions to the stabbings described by witnesses. Furthermore, while defendant was callous in his remark that stabbing "bums" was not serious, defendant's planning and execution of Mr. Holt's murder also evidenced extreme callousness, as did his expression of apparent irritation in failing to kill fellow patient Mr. McCully during that attack.

### 3. *Alleged Error Regarding Number of Special Circumstances*

Defendant contends the trial court erroneously submitted six, rather than one, prior murder conviction special-circumstance allegations to the jury.

The indictment filed against defendant included two counts. Count 1 alleged assault by a person serving a life sentence with force likely to produce great bodily injury which resulted in death (§ 4500), and count 2 alleged premeditated murder (§ 187, subd. (a)). Count 2, but not count 1, also included six allegations of prior first degree murder convictions. (§ 190.2, subd. (a)(2); hereafter section 190.2(a)(2).)

Section 190.2(a)(2), added by initiative in 1978, provides in relevant part: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] . . . The defendant was convicted previously of murder in the first or second degree." Thus, to find the allegation true, a jury simply must find a defendant has suffered a prior first or second degree murder conviction.

When a defendant has *more* than one prior first or second degree murder conviction, the most reasonable reading of the language of section 190.2(a)(2) is that a defendant is subject to a prior murder special circumstance for each of these convictions. Section 190.2(a)(2) does not say that only *one* such prior conviction may be used, or that all such convictions must

be combined into a single special circumstance. The electorate could reasonably conclude a defendant who previously murdered six people, and suffered six prior murder convictions as a result, is more culpable than a defendant who previously murdered only one person, and sustained only one prior murder conviction. It seems unlikely that section 190.2(a)(2) was intended to impose only one special circumstance for both individuals despite their disparate records.

In contrast to section 190.2(a)(2), section 190.2, subdivision (a)(3) provides as a special circumstance that "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." Section 190.2, subdivision (a)(3) does not permit a separate multiple-murder special circumstance to be attached to each murder conviction sustained in the capital case because such duplicative use of multiple-murder special circumstances "artificially inflates the seriousness of the defendant's conduct." (*People v. Jones* (1991) 53 Cal.3d 1115, 1148 [282 Cal.Rptr. 465, 811 P.2d 757].) However, no such duplication or artificial inflation arises when a special circumstance is charged for each earlier murder of which the defendant was previously convicted. Moreover here, the special circumstance allegations attached only to count 2, not to both counts.

Indeed, while we do not appear to have previously decided the question, our cases have assumed a defendant is subject to a prior murder special circumstance for each prior first or second degree murder conviction. (*People v. Ray* (1996) 13 Cal.4th 313, 325 [52 Cal.Rptr.2d 296, 914 P.2d 846] [noting jury found true two special circumstance allegations under § 190.2(a)(2) for the defendant's two prior murder convictions]; *People v. Nicolaus* (1991) 54 Cal.3d 551, 561 [286 Cal.Rptr. 628, 817 P.2d 893] [the "defendant admitted the truth of the three alleged prior-murder special circumstances, having been previously convicted of the murders of his three children"]; *id.* at p. 567; *People v. Hendricks* (1987) 43 Cal.3d 584, 588–589, 595–596 [238 Cal.Rptr. 66, 737 P.2d 1350] [upholding under § 190.2(a)(2) two prior murder conviction special circumstances imposed for two prior murder convictions; rejecting challenge that special circumstances were invalid because murders in prior convictions occurred after the capital crimes].) The cases defendant cites are inapposite, since in both cases the defendant had suffered only *one* prior murder conviction. (*People v. Andrews* (1989) 49 Cal.3d 200, 206, 221, 224 [260 Cal.Rptr. 583, 776 P.2d 285] [striking two of three prior murder special circumstances when the defendant had one prior murder conviction, and three current murder convictions]; *People v. Allen* (1986) 42 Cal.3d 1222, 1244, 1246, 1274 [232 Cal.Rptr. 849, 729 P.2d 115] [same].)

### 4. *Alleged Instructional Error*

■ Defendant makes numerous claims of instructional error. We find none meritorious. In particular, the trial court did not err in failing to require the jury to make unanimous separate findings of the truth of specific aggravating evidence, or to render a statement of reasons for its verdict in the event it imposed death. (*Prieto, supra,* 30 Cal.4th at pp. 263, 275; *People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Nothing in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], affects our conclusions in this regard. (*Prieto,* at pp. 263, 275.)

■ Nor did the trial court violate defendant's Eighth Amendment rights when it failed to instruct the jury it did not have to unanimously agree on mitigation. The penalty phase instructions "conveyed unmistakably that jurors were to undergo an individualized process of weighing aggravating and mitigating factors. . . . [T]here was little likelihood of the jury's reading into the instructions a requirement that they agree unanimously on any circumstance or evidence as mitigating." (*People v. Welch* (1999) 20 Cal.4th 701, 769 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Nor should the jury have been instructed that the reasonable doubt standard governed its penalty determination, i.e., that to impose a sentence of death they had to be persuaded beyond a reasonable doubt that the aggravating circumstances were so substantial in comparison with the mitigating circumstances that they warranted death, and that death was the justified and appropriate sentence in view of all the evidence. (*Medina,* at p. 782; *Bradford, supra,* 14 Cal.4th at p. 1059.) Nothing in *Ring v. Arizona, supra,* 536 U.S. 584, or *Apprendi v. New Jersey, supra,* 530 U.S. 466, mandates a different conclusion. (*Prieto,* at pp. 263, 275.)

### DISPOSITION

The judgment is affirmed.

Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring and dissenting.—I join the majority in upholding defendant's convictions for murder (Pen. Code, § 187)[1] and for assault by a prisoner serving a life sentence, resulting in great bodily injury or death (§ 4500), as well as the prior-murder special-circumstance allegations (§ 190.2, subd. (a)(2)). Unlike the majority, however, I would reverse the judgment of death because of jury misconduct during the penalty phase deliberations.

---

[1] All further statutory citations are to the Penal Code.

## I

After the jury's verdict of a death sentence, defendant moved for a new trial, alleging that two jurors, B.P. and K.A., had engaged in misconduct during the penalty phase deliberations. Because neither party had asked for an evidentiary hearing, the trial court based its ruling entirely on declarations submitted by the parties, most important of which were declarations from B.P. and K.A.

Juror B.P. mentioned that she had voted for death in three straw votes on the first day of deliberations (a Friday). She then described a conversation with her pastor that weekend: "I spoke with my pastor about the difficulty of making the decision. I told him, 'Pastor, I'm doing jury duty on a murder case. Is there anything in the Bible which speaks against the death penalty?' I also told him that I had made up my mind about the verdict. [¶] In response, my pastor told me, '[B.], I think I know what case you are on. There is no place in the Bible that takes the law out of the Bible. If you are sitting on the case I'm thinking you are sitting on, if I was in your shoes, *I would not hesitate to give him the death penalty.*' " (Italics added.)

With respect to Juror K.A., she said that after the first day of deliberations she told her husband of "the stress [she] felt in making the decision." He urged her to discuss the matter with her pastor and showed her this passage from the Bible: "If a man strikes someone with an iron object so that he dies, he is a murderer; the murderer shall be put to death. Or if anyone has a wooden object in his hand that could kill, and he hits someone so that he dies, he is a murderer; the murderer shall be put to death. If anyone with malice aforethought shoves another or throws something at him intentionally so that he dies or if in hostility he hits him with his fist so that he dies, that person shall be put to death; he is a murderer. The avenger of blood shall put the murderer to death . . . . [¶] But if without hostility someone suddenly shoves another or throws something at him unintentionally or, without seeing him, drops a stone on him . . . and he dies, then since . . . he did not intend to harm him, the assembly must . . . protect the one accused of murder from the avenger of blood . . . . Anyone who kills a person is to be put to death as a murderer only on the testimony of witnesses. But no one is to be put to death on the testimony of only one witness. Do not accept a ransom for the life of a murderer, who deserves to die. He must surely be put to death." (Numbers 35:16–35:25, 35:30–35:31.)

On Sunday, Juror K.A. and her husband attended Bible study at their church. There her husband made copies of the Bible verses quoted above. The pastor, who knew K.A. was a juror in defendant's capital murder case, told K.A. he understood (apparently from talking to K.A.'s husband) that

K.A. had read several Bible verses. K.A. replied that the verses had given her comfort. The pastor described the verses as "good scriptures" and said "in a joking manner that *if he were a juror he would impose the death penalty . . . .*" (Italics added.)

The next Monday, Juror K.A. highlighted certain passages on the copies of the Bible verses and brought them to court. When, during deliberations, some jurors mentioned the difficulty in "making a life and death decision," K.A. showed them the highlighted Bible passages. Juror B.P. told K.A. that she too had spoken to her pastor, who had given her the same Bible verses that K.A. had brought to court.[2]

The trial court denied defendant's motion for new trial.

## II

No matter how inadvertent, a juror's receipt of information not presented in court is juror misconduct. "Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice . . . ." (*People v. Nesler* (1997) 16 Cal.4th 561, 579 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.) (*Nesler*).) In the words of the United States Supreme Court: "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant." (*Remmer v. United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 74 S.Ct. 450].)[3]

---

[2] The majority appears to conclude that this remark by Juror B.P. did not occur until after deliberations, pointing out that Juror K.A.'s declaration is ambiguous as to when B.P. made the comment, and that B.P. declared that she did not tell the other jurors what her pastor had said. (Maj. opn., *ante*, at p. 309, fn. 13.) But another juror, E.M., declared that *during deliberations* B.P. mentioned that she had spoken to her pastor. It is reasonable to infer that the declarations of K.A. and E.M. both refer to the same statement by B.P., in which case E.M.'s declaration demonstrates that it was said during deliberations.

[3] In the wake of two more recent decisions by the United States Supreme Court (*United States v. Olano* (1993) 507 U.S. 725 [123 L.Ed.2d 508, 113 S.Ct. 1770]; *Smith v. Phillips* (1982) 455 U.S. 209 [71 L.Ed.2d 78, 102 S.Ct. 940]), there is doubt as to the continuing validity of the presumption of prejudice articulated in *Remmer v. United States, supra,* 347 U.S. 227. (See, e.g., *U.S. v. Dutkel* (9th Cir. 1999) 192 F.3d 893, 894–896 [presumption applies to cases of jury tampering]; *U.S. v. Sylvester* (5th Cir. 1998) 143 F.3d 923, 934 ["the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*," and remains applicable "only when the court determines that prejudice is likely"]; *U.S. v. Williams-Davis* (D.C. Cir. 1996) 319 U.S. App. D.C. 267 [90 F.3d 490, 496] [presumption exists but is "not . . . particularly forceful"]; *U.S. v. Zelinka* (6th Cir. 1988) 862 F.2d 92, 95 ["*Smith v. Phillips* reinterpreted

Here, the pastors of Jurors B.P. and K.A. told them that they (the pastors) would have no problem voting for the death penalty in defendant's case. K.A.'s husband implied a similar view when, before K.A.'s talk with her pastor, he showed her Bible verses expressing the view that all intentional killers should be put to death. The two jurors' receipt of those communications amounted to jury misconduct. (*Nesler, supra,* 16 Cal.4th at p. 579; see also *Stockton v. Com. of Va., supra,* 852 F.2d 740 [jury bias occurred when, at a meal during penalty deliberations, restaurant owner told jurors they should impose the death sentence].)

Was the misconduct prejudicial to defendant? "When juror misconduct involves the receipt of information about a party or the case from *extraneous* sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is *inherently and substantially likely* to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is *substantially likely* a juror was '*actually biased*' against the defendant." (*Nesler, supra,* 16 Cal.4th at pp. 578–579, italics added.)[4]

Here, the material Juror K.A. received from sources outside of the court—the views of her husband and her pastor on the propriety of a death sentence in defendant's case—was "inherently and substantially likely" to have influenced her vote. Normally a spouse and a spiritual advisor would have a great influence on a juror having to decide a matter of life and death. Here, not just one, but *both* of these highly influential people in essence told K.A. they thought defendant should be sentenced to death. These views were reinforced when Juror B.P. later told K.A. that B.P.'s pastor too had given her the same Bible verses K.A. had shared with the jurors.

Even if the receipt of this outside information was not "inherently and substantially likely" (*Nesler, supra,* 16 Cal.4th at p. 579) to have influenced

---

*Remmer* to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless"]; *Stockton v. Com. of Va.* (4th Cir. 1988) 852 F.2d 740, 744 [presumption still applies to third party communications with jurors].) I see no need to address this question here, because I find the jury misconduct here to be prejudicial by applying the standards enunciated by California decisions applying state law.

[4] Although the Chief Justice's opinion in *Nesler, supra,* 16 Cal.4th 561 reflected the view of only three justices, Justice Baxter's dissenting opinion (signed by Justices Chin and Brown) did not disagree with this standard; rather, it disagreed with the Chief Justice's conclusion that application of the standard required reversal of the defendant's conviction. (*Id.* at pp. 593–599 (dis. opn. of Baxter, J.).) Nor did Justice Mosk's concurring opinion express any disagreement with the standard. (*Id.* at pp. 591–593 (conc. opn. of Mosk, J.).)

Juror K.A., it is "substantially likely" that she "was 'actually biased' " (*ibid.*) against defendant. Her bias is demonstrated by her decision to show the other jurors her highlighted passages from the Bible verses on the appropriateness of killing a killer. As this court has recognized, "[a] juror's disclosure of extraneous information to other jurors tends to demonstrate that the juror intended the forbidden information to influence the verdict and strengthens the likelihood of bias" (*Nesler, supra,* 16 Cal.4th at p. 587), whereas an unbiased juror will realize that the jury may not consider the information and therefore is unlikely to mention it (*In re Carpenter* (1995) 9 Cal.4th 634, 657 [38 Cal.Rptr.2d 665, 889 P.2d 985]). In handing out to the other jurors the Bible verses that her husband had showed her and her pastor had commended as "good scriptures," Juror K.A. demonstrated that she had been affected by their comments and therefore that she was biased.

With regard to Juror B.P., the question of prejudice is closer, for she had talked only to her pastor, whereas Juror K.A. had talked to both her spiritual advisor and her husband, both of whom indicated their approval of executing defendant. Nevertheless, in my view B.P. was substantially likely to harbor a bias against defendant. As in this case, *Stockton v. Com. of Va., supra,* 852 F.2d 740, involved an unsolicited communication to jurors. There, a restaurant owner approached a group of four jurors while they were taking a lunch break in the middle of their deliberations in a capital case. He spoke to them for about five minutes, asking whether they had reached a verdict yet and telling them " 'they ought to fry the son of a bitch.' " (*Id.* at p. 742.) After lunch the jury returned a verdict of death. The federal circuit court reversed, explaining that the comment, which came in the middle of deliberations, "posed a potential for prejudice that was too serious to ignore." (*Id.* at p. 745.) Here, the likelihood of prejudice was far greater than in *Stockton,* because B.P. conversed not with a restaurateur but with her pastor. For advice and comfort in difficult matters of life and death, many people turn to their pastor, whose views are likely to carry far more weight than those of a stranger encountered in a restaurant.

## III

The majority acknowledges there was misconduct by Jurors K.A. and B.P. but concludes it was harmless. As I shall explain, the majority's reasons are not persuasive.

Juror K.A. was exposed to three separate acts of misconduct: (1) receiving from her husband Bible verses approving of putting to death anyone who had intentionally killed; (2) hearing her pastor's approval of the Bible verses, which he described as "good scripture," accompanied by his comment that he would vote to execute defendant; and (3) learning from Juror B.P. that her

own pastor had referred her to the very same Bible verses. Reversal is required if there is a "substantial likelihood" that K.A. was influenced by the *combined effect* of these three acts. Instead, the majority looks at the acts separate from each other. After stating that K.A. was not affected by her husband's conduct (maj. opn., *ante*, at p. 304), it likewise concludes that she was not influenced by her pastor's conduct (*id.* at p. 307). Only in a footnote does it mention B.P.'s comment that her pastor had expressed views similar to those of K.A.'s husband and pastor (*id.* at p. 309, fn. 13), and it dismisses the possibility that these three acts were collectively prejudicial in a sentence, without analysis (*id.* at p. 310). But the views of these three persons reinforced each other, with a combined effect that was likely to be far greater than the impact that any one of them would have had in isolation.

In finding the misconduct of Juror B.P. harmless, the majority stresses that before consulting her pastor she had voted for the death penalty on three ballots taken by the jurors during their deliberations. But jurors frequently change their minds during deliberations; indeed, that is the whole point of deliberating. Moreover, B.P.'s decision to bring up the matter with her pastor after those votes suggests that she remained uncertain. B.P.'s conversation with her pastor may well have strengthened her resolve to vote in favor of the death penalty, leaving her far less susceptible to the arguments of those jurors who were urging a sentence of life without possibility of parole.

The majority also relies on the strength of the aggravating evidence at the penalty phase: defendant's six prior convictions for murdering homeless men, his own testimony that "I would not change a thing I did in my life," and the concession by psychiatrists who testified for the defense that defendant was an "extremely dangerous" sadist who derived sexual excitement from killing. Given this evidence, the majority concludes, the extrajudicial communications of Jurors K.A. and B.P. were unlikely to have affected their votes to sentence defendant to death. (Maj. opn., *ante*, at pp. 305, 309.)

Granted, the aggravating evidence was strong. But the majority ignores the strong *mitigating* evidence presented to the jury. Five defense experts (three psychiatrists and two psychologists) described defendant, who was 30 years old at the time of trial, as severely ill mentally, suffering from paranoid schizophrenia. He complained that certain well-known entertainers were "in the kitchen excreting in his food." He was convinced that the Mayor of Los Angeles, the Governor of California, and the President of the United States all conspired against him. He thought people watched him through the television set. He talked of conversations with his dead grandparents, and said his mother printed counterfeit money in her basement. He insisted that the homeless men he had killed were not really dead, and he felt compelled to clean his jail cell with a toothbrush six to 10 times a day. In short, the defense

presented compelling evidence that defendant, although not legally insane at the time of the offenses (see § 25, subd. (b) [a defendant is insane only if "he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense"]), suffered from a mental illness that destroyed his capacity for rational thought.

If defendant's doctors are right, defendant's mental deficiencies are comparable in severity to mental retardation. In *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242], the United States Supreme Court held that to execute the mentally retarded is cruel and unusual punishment, reasoning that retarded persons "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." (*Id.* at p. 318.) The same mental capacities are impaired in a person suffering from paranoid schizophrenia, and the impairment may be equally grave. Although mental illness does "not warrant an exemption from criminal sanctions" (*ibid.*), California law recognizes it as a mitigating factor that weighs against capital punishment. (§ 190.3, factor (d).) Surely a reasonable juror could have concluded that defendant's mental illness diminished his personal culpability to such an extent as to render death an inappropriate penalty.

For the reasons given above, I would affirm defendant's convictions for murder and for assault by a prisoner serving a life sentence resulting in great bodily injury or death, as well as the special circumstance findings, but I would reverse the judgment of death.

George, C. J., concurred.

**MORENO, J.,** Concurring and dissenting.—The majority is correct that the crimes committed by defendant Joseph Martin Danks were horrific and his lack of remorse shocking. Already serving a term of 156 years to life for the murders of six transients in Los Angeles County, defendant choked his 67-year-old cellmate to death because he believed that killing old people was "the Lord's work." He choked and stabbed another inmate in 1989, and stabbed his lawyer in the face during the penalty phase of this trial. He stated to law enforcement officers, after his latest murder, that he wanted the death penalty. He told jurors during his penalty phase testimony that he stabbed the transients while they slept and, directly addressing the jurors, stated, "I would do it to you too."

But the jury also heard that defendant was paranoid, delusional, and mentally ill. Doctors confirmed this diagnosis. Defendant believed that

entertainers Burt Reynolds and Johnny Carson excreted into his food. He cleaned his cell with a toothbrush six to 10 times a day. He thought people watched him through the television. He thought he was being brainwashed by music piped into his jail cell. Witnesses recounted incident after incident, dating back to his teen years, of defendant's bizarre and disturbed behavior.

Against this backdrop, and in direct violation of the court's order not to discuss trial matters with nonjurors, two jurors took the extraordinary step of discussing their possible death verdict with their pastors. Astoundingly, in separate incidents, both pastors assured the two jurors that the death penalty was the appropriate punishment for defendant. Yet the majority finds this egregious juror misconduct nonprejudicial. While I concur in the majority's affirmance of defendant's murder conviction and the special circumstance findings, I dissent from the affirmance of the death judgment.

Penalty phase deliberations began Friday afternoon, February 5, 1993. Juror K.A. stated in her declaration that the judge "had told us we could not speak with persons about the case. But because of the feelings I had, I felt the necessity of talking to my husband." K.A.'s husband noticed she was "on edge" and advised her that reading scripture from the Bible might be of benefit. He showed her verses from the Book of Numbers that stated, in no uncertain terms, that murderers shall be put to death,[1] and told her that it was permissible to discuss the case with their pastor "because a pastor is of a higher authority." Sunday evening, February 7, 1993, during Bible study at their church facility, K.A. and her husband met with their pastor. K.A. stated, "[t]hat is where my husband made a copy . . . from our Bible containing the Book of Numbers verses," which was shown to the pastor. The pastor, knowing K.A. to be a juror on defendant's case, said "those were good scriptures," and then "jokingly" said that *he* "would impose the death penalty on Mr. Danks."[2] K.A. returned to court for deliberations the following day. She stated, "I took the copy of the pages from the Book of Numbers with me. *I had highlighted certain portions of that.*" (Italics added.) She added, "During deliberations, other jurors expressed feelings about the difficulty and responsibility of making a life or death decision. I told the other jurors about my copy of the pages from the Book of Numbers. I then shared [my

---

[1] The first two verses read: "If a man strikes someone with an iron object so that he dies, he is a murderer; the murderer shall be put to death. Or if anyone has a stone in his hand that could kill, and he strikes someone so that he dies, he is a murderer; the murderer shall be put to death." (The complete version of this scripture appears in the majority opinion, *ante*, at page 298, footnote 10.)

[2] Given the pastor's "higher authority" and the seriousness of the subject matter, K.A.'s remark that her pastor was "joking" when he said he "would impose the death penalty on Mr. Danks" does not diminish the impact of the pastor's statement. The pastor's comments were evidently designed to further put K.A. at ease and make her more comfortable with a decision to impose a capital sentence on defendant.

highlighted copy] with the other jurors by passing it around to the other jurors." K.A. admitted that "our Christian beliefs [were] being discussed during deliberations," causing one juror to take offense "later in the day" and stating words to the effect that "God does not play a part in this decision." The jury returned a death verdict the following day.

A second juror, B.P., also sought guidance from her pastor during the penalty phase deliberations. A third juror, E.M., declared that "During the penalty phase deliberat[i]ons in the [Danks] case, [B.P.] told me that she had talked to her pastor for guidance on the case." B.P. acknowledged in her declaration that "During the penalty phase deliberations I spoke to my pastor." She stated, "After the first day of deliberations, I spoke with my pastor about the difficulty of making the decision." B.P. added, "I wanted to know what the Bible said about the death penalty." Her pastor told her, "[B.], I think I know what case you are on," and stated, "if I was in your shoes, I would not hesitate to give him the death penalty." K.A. added that "B.P. told me that she had talked to her pastor and he had referred her to the same chapter and verses in the Book of Numbers."

Based on these declarations, the majority remarkably finds no prejudicial juror misconduct. It reaches this erroneous conclusion by misapplying the test for determining prejudicial juror misconduct based on the receipt of extraneous information, set forth in a trilogy of cases—*People v. Nesler* (1997) 16 Cal.4th 561, 580 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.) (*Nesler*), *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter*), and *People v. Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676] (*Marshall*).

Specifically, in its examination of "actual bias," the majority fails to acknowledge that, in juror misconduct cases based on the receipt of extraneous information, there arises a presumption of prejudice that must be rebutted by the prosecution (*Marshall, supra,* 50 Cal.3d at p. 949), and that determining "[w]hat constitutes 'actual bias' of a juror varies according to the circumstances of the case" and involves an inquiry into whether a juror was "actually being influenced by extraneous information about a party." (*Nesler, supra,* 16 Cal.4th at pp. 580, 581; and see *Marshall, supra,* 50 Cal.3d at pp. 950–951.)

Equally troubling is the fact that the majority analyzes the multiple incidents of juror misconduct here in piecemeal fashion, thereby sidestepping the requirement set forth in *Carpenter* that juror misconduct based on the receipt of extraneous information be analyzed in toto. As we stated in *Carpenter,* "the totality of circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose." (*Carpenter, supra,* 9 Cal.4th at p. 654.)

In addition, the majority ignores the line of cases that have found prejudicial misconduct where a jury receives information that diminishes its sense of responsibility for its verdict (e.g., *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*)), and makes short shrift of those cases that have found misconduct where the Bible is interjected into the proceedings. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*) and *People v. Mincey* (1992) 2 Cal.4th 408 [6 Cal.Rptr.2d 822, 827 P.2d 388] (*Mincey*).) Finally, the majority fails to appreciate that this deplorable juror misconduct undermines the integrity of California's death penalty process.

## I.

In *Nesler, supra*, 16 Cal.4th 561, we reversed a jury verdict because a juror received extraneous information about the defendant and shared it with other jurors. The lead opinion, which was written by Chief Justice George and joined by Justices Kennard and Werdegar, summarized the law in this area as follows: "A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citations.] A defendant 'is entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to a unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.] [¶] Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. [Citations.] 'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. . . . [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' [Citation.] As the United States Supreme Court has explained: 'Due process means a jury *capable and willing to decide the case solely on the evidence before it* . . . .' [Citations.]" (*Id.* at p. 578.)

As such, "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' [Citations.] This rule 'has significant support in the case law' [citation], both within California [citation] and without [citation]. [Citations.] [¶] 'The ultimate issue of

influence on the juror is resolved by reference to the substantial likelihood test, an objective standard.' . . . [¶] Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental' unfairness and calls for reversal without consideration of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*Marshall, supra,* 50 Cal.3d at pp. 950–951.)

In *Nesler*, a juror received unflattering information about the defendant from a woman in a bar during the sanity phase of the defendant's manslaughter trial. The woman claimed she had been a babysitter for the defendant. During deliberations, however, the juror stated she "knew" the defendant's babysitter, and remarked that the defendant would leave her children for long periods of time, was not a good mother, and used illicit drugs. (*Nesler, supra,* 16 Cal.4th at p. 574.) She argued to jurors that "if [they] knew what she knew" they would find the defendant sane. (*Id.* at p. 571.) The jury ultimately found that the defendant was sane.

The lead opinion in *Nesler* found that the People had not rebutted the presumption of prejudice arising from this juror's misconduct because there was a substantial likelihood that the extraneous information impermissibly influenced her decision: "Although [the juror] knew she should not discuss matters that were not part of the evidence presented at trial, she intentionally interjected this outside information into the deliberations . . . . In our view, [the juror's] repeated references to and use of the outside information during deliberations establish a substantial likelihood that her extraneous knowledge concerning defendant caused her to prejudge issues that arose during deliberations and to render a verdict that was not based solely upon the evidence presented in court. As defendant points out, if [the juror] had not been influenced by what she had learned, she would not have used the information to attempt to convince other jurors that defendant truly was a bad mother and more involved with drugs than the evidence showed." (*Nesler, supra,* 16 Cal.4th at p. 583.)

Justice Mosk, who concurred in the judgment in *Nesler*, agreed that the "facts compel[led]" the conclusion that the juror committed misconduct, and

the "law compel[led]" the conclusion that these facts gave rise to a presumption of prejudice. (*Nesler, supra,* 16 Cal.4th at p. 592 (conc. opn. of Mosk, J.).) Unlike the lead opinion, however, Justice Mosk stated he could not determine whether there was, in fact, a substantial likelihood of the juror's actual bias: "One can reasonably conclude *either* that [the juror] was 'actually' biased by what she heard *or* that she was not, depending on whether one infers *either* that she was herself influenced *or* that she was simply attempting to influence others. With matters thus in equipoise, the presumption of prejudice stands unrebutted." (*Id.* at pp. 592–593.)

A majority of the court in *Nesler* thus concluded that the presumption of prejudice that arises in juror misconduct cases involving the receipt of extraneous information had not been rebutted. Fairly read, the lead opinion concluded that the presumption of prejudice is not rebutted where there is a substantial likelihood that the juror herself was improperly influenced by the extraneous material. Justice Mosk concluded that the presumption of prejudice is not rebutted where there is proof either that the juror herself was improperly influenced or that she was simply attempting to improperly influence others. As such, a majority of this court has held that the presumption of prejudice arising in juror misconduct cases involving the receipt of extraneous information is not rebutted where the juror herself was improperly influenced.

The majority here acknowledges that K.A. and B.P. committed juror misconduct in this case by speaking to their pastors (maj. opn., *ante,* at pp. 307, 309), and finds it "troubling that during deliberations not one but two jurors had conversations with their pastors that ultimately addressed the issue being resolved at the penalty phase in this case." (Maj. opn., *ante,* at p. 306, fn. 11.) More troubling is the fact that the majority finds K.A.'s and B.P.'s juror misconduct nonprejudicial.

Based on K.A.'s juror declaration, there is, at a minimum, a substantial likelihood that K.A. was improperly influenced by her pastor's assurance that the death penalty was the appropriate punishment for defendant. K.A.'s declaration contains the following information, which *Carpenter* teaches we must view in its totality: (1) K.A. knew she could not speak to nonjurors about the case; (2) nonetheless, because of her uncertainty in imposing a death verdict, she discussed the case first with her husband;[3] (3) then, on

---

[3] The majority states that K.A.'s statement in her declaration, "But because of the feelings I had, I felt the necessity of talking to my husband," is excludable under Evidence Code section 1150. (Maj. opn., *ante,* at pp. 301–302.) I disagree. The statement explains K.A.'s conduct in talking to a nonjuror and does not delve into the subjective reasoning process of her verdict. Thus, this statement is "admissible evidence . . . as to statements made, or conduct, conditions, or events occurring . . . of such a character as is likely to have influenced the verdict

Sunday night, while at their church facility, and hours before deliberations were to be resumed the following morning, she and her husband met with their pastor, who knew she was a juror on defendant's case; (4) at this time, K.A.'s husband made a copy of the Book of Numbers verses to show to the pastor; (5) the pastor, a person assertedly "of a higher authority," said those were "good scriptures," and (6) added that he would impose the death penalty on defendant; (7) thereafter, K.A. herself, not her husband, highlighted certain portions of the "good scriptures" supporting the death penalty, and (8) took them to court the following morning; (9) during deliberations, she told the other jurors about her highlighted copy of Book of Numbers verses; (10) shared this highlighted copy with the other jurors who had expressed feelings about the difficulty and responsibility of imposing a death verdict; and (11) she admitted that the jury discussed their "Christian beliefs" during deliberations to the extent that, later in the day, a juror became offended because "God does not play a part in this decision."

Based on the above facts, it is clear that K.A. had not yet made her death penalty decision after deliberations had concluded on Friday. This is evident from the facts that she was "on edge," "felt the necessity" of talking to her husband about the case, and met with her pastor to talk about the case.[4] But after receiving her pastor's assurance that the Book of Numbers verses were "good scriptures" and that he would impose the death penalty on defendant— extraneous information outside the deliberative process that the majority concedes was improperly received—K.A. arrived at her decision to impose the death penalty on defendant. That this information was critical to her decision is evident from the facts that she highlighted her copy of the Book of Numbers scripture after the meeting and brought it to deliberations the following morning, that she told other jurors about these particular Bible verses, and that she shared this scripture with undecided jurors.

The language in *Nesler* applies with particular force here: "Although [K.A.] knew she should not discuss matters that were not part of the evidence presented at trial, she intentionally interjected this outside information into the deliberations . . . . In our view, [K.A.'s] repeated references to and use of the outside information during deliberations establish a substantial likelihood

---

improperly." (Evid. Code, § 1150, subd. (a).) As noted by the majority, *ante*, at page 302, "This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror . . . .' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

[4] As noted by the majority (maj. opn., *ante*, at p. 298), K.A. stated in her declaration, "I was leaning toward the death penalty but I felt discomfort about imposing the death penalty. If I was going to vote for the death penalty I wanted to feel good about it." This statement was excludable under Evidence Code section 1150, subdivision (a) (maj. opn., *ante*, at pp. 301–302), and does not enter into the conclusion that K.A. had not yet made her death penalty decision after deliberations concluded on Friday.

that her extraneous knowledge concerning defendant caused her to prejudge issues that arose during deliberations and to render a verdict that was not based solely upon the evidence presented in court. As defendant points out, if [K.A.] had not been influenced by what she had learned, she would not have used the information to attempt to convince other jurors" struggling with their death penalty verdict. (*Nesler, supra,* 16 Cal.4th at p. 583.)

There is also a substantial likelihood that B.P. was impermissibly influenced by her own misconduct. Despite her claim that she voted the "same way" before and after talking to her pastor during deliberations, an objective view of the evidence suggests that her earlier votes were tentative. B.P. candidly acknowledged that she spoke with her pastor about "the difficulty of making the decision." Her pastor then told her that he "would not hesitate" to give defendant the death penalty. The damage was done. Juror E.M. stated that, after this meeting, and "[d]uring the penalty phase deliberat[i]ons in the [Danks] case, [B.P.] told me that she had talked to her pastor for guidance on the case." Simply stated, if B.P. had been certain of her verdict, she would not have asked her pastor for guidance in making this difficult decision.

In addition, K.A. added that "B.P. told me that she had talked to her pastor and he had referred her to the same chapter and verses in the Book of Numbers." Thus, during the deliberation period, K.A. and B.P. each received *confirmation* that the other's pastor approved imposing the death penalty.[5] Given the high regard the two jurors had for their pastors, this mutual reinforcement of a reliance on biblical and pastoral authority further heightened the resulting prejudice.

In light of the majority's emphasis on the "strength" of the evidence against defendant in finding these multiple acts of juror misconduct nonprejudicial (maj. opn., *ante,* at pp. 305–306), the test articulated in *Marshall* bears repeating: " 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. . . .'

---

[5] While the majority trumpets the fact that B.P. declared that "[a]t no time during the deliberations did I relate to the other jurors what my pastor had said to me" as evidence of the nonprejudicial nature of B.P.'s misconduct (maj. opn., *ante,* at p. 309, fn. 13), it completely misses the mark. Specifically, Juror E.M. stated in her declaration that during deliberations B.P. stated she had asked her pastor for guidance. Thus, even if B.P. did not relate to other jurors the specifics of that conversation, she apparently did not hesitate to make the jury aware that such a conversation took place.

The majority also makes the implausible suggestion that "we have no idea" when B.P. told K.A. " 'she had talked to her pastor and he had referred her to . . . the Book of Numbers.' " (Maj. opn., *ante,* at p. 309, fn. 13.) Given Juror E.M.'s declaration that during deliberations B.P. told the jurors she had asked her pastor for guidance, and given the fact that the purpose of the jurors' declarations was to determine whether prejudicial juror misconduct occurred *during deliberations,* the only reasonable conclusion is that B.P. mentioned her pastor's conversation to K.A. during deliberations.

[Citation.] [¶] Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial . . . introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice." (*Marshall, supra*, 50 Cal.3d at p. 951.)

An examination of K.A.'s behavior before and after the Sunday night meeting with her pastor leads to the inescapable conclusion that she was actually and improperly influenced by her pastor's assurance that the death penalty was the proper punishment for defendant (see *Nesler, supra*, 16 Cal.4th at p. 583), and it is substantially likely that B.P., despite her remarks to the contrary, was also improperly influenced by her pastor's assurance on this very topic. "When the [juror] misconduct in question supports a finding that there is a substantial likelihood that *at least one juror* was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial." (*Marshall, supra*, 50 Cal.3d at p. 951, italics added.) Moreover, "under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' [Citation.]" (*Caldwell, supra*, 472 U.S. at p. 329.)

Reversal under these facts is mandated. The flagrant juror misconduct here violates the test set we forth in both *Marshall* and *Nesler*. Not one, but two jurors were impermissibly influenced by extraneous information they *solicited* outside the deliberative process. The integrity of this trial was undermined, these two jurors were not impartial, and this verdict should not stand.

## II.

Grounds for reversal similarly exist when a juror receives information that improperly influences her verdict in the sense that it diminishes her sense of responsibility for her verdict. (*Caldwell, supra*, 472 U.S. 320.) In *Caldwell*, the high court set aside a judgment of death because the prosecutor told the jurors in closing argument that the state supreme court would automatically review their decision that death was the appropriate penalty. The high court stated: "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. This Court has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' [Citation.]" (*Id.* at pp. 328–329.) The high court therefore reasoned that such information "presents an intolerable danger that the jury will in fact

choose to minimize the importance of its role." (*Id.* at p. 333.) It concluded, "This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated." (*Id.* at p. 341.)

We applied the *Caldwell* rule in *People v. Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940], a case in which the prosecutor told the jury: "Whether or not [the defendant] should live or die was decided by the voters of this state when they passed [the death penalty law], when they set the criteria. They decided who lives and who dies. You decide, does aggravating outweigh mitigating. That is your job. That is all you decide. The law does the rest. It is not you." (*Id.* at p. 929, italics omitted.) In essence, "the prosecutor informed the jury that 'the law' decided whether *this* defendant would live or die, and that it was not the jury's responsibility and obligation to decide the propriety of death as a penalty in this case." (*Id.* at p. 930.) As such, "the jury was misled as to its discretion and responsibility in fixing the appropriate penalty, and hence . . . the judgment of death must be set aside under *Caldwell* . . . ." (*Id.* at p. 931.)

Despite the fact that the misconduct in *Caldwell* was perpetrated by a state actor, the general reasoning of *Caldwell* is instructive here. As stated by the high court, "the uncorrected suggestion that the responsibility for any ultimate decision of death will rest with others presents an intolerable danger that the jury will, in fact, minimize the importance of its role." (*Caldwell, supra,* 472 U.S. at p. 333.)

Here, after seeking guidance in violation of a court order not to discuss the case with nonjurors, two jurors were told by their personal spiritual leaders that death was the appropriate penalty for this defendant. Such advice would likely have a greater impact upon a juror than receiving similar unsolicited information from the prosecutor, and the fact that this advice was received out of court gave defendant no opportunity to object or to rebut the evidence.

As we said in *Hughes, supra,* 27 Cal.4th at page 389, in reference to a claim of prosecutorial misconduct in invoking the Bible: " '[T]he primary vice in referring to the Bible and other religious authority is that such argument may "diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." ' [Citation.]" But the misconduct here is far more egregious than the misconduct that occurs when the

prosecutor exhorts the jury to impose the death penalty by referencing the Bible. When the prosecutor invokes the Bible, the effect on the jury is speculative, and we have found such misconduct harmless by pointing to the prosecutor's legitimate reasons in support of a death penalty verdict. (See, e.g., *People v. Slaughter* (2002) 27 Cal.4th 1187, 1208–1209 [120 Cal.Rptr.2d 477, 47 P.3d 262]; *People v. Welch* (1999) 20 Cal.4th 701, 761–762 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Roybal* (1998) 19 Cal.4th 481, 519–521 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

Here, however, not one, but two jurors sought guidance from their personal spiritual leaders. Not only were they referred to verses in the Bible that supported the death penalty, they were assured that it was proper to impose the death penalty on defendant. The effect of the pastors' assurances was palpable. K.A. highlighted a copy of the Bible verses in support of the death penalty and shared that copy with undecided jurors. B.P. also informed other jurors during deliberations that her pastor offered her guidance on this difficult decision, and had referred her to the same biblical passages.

K.A.'s and B.P.'s misconduct is prejudicial because it not only diminished their personal responsibility in imposing a death verdict, but the jury's sense of responsibility as a whole. Given that the " 'qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination' " (*Caldwell, supra,* 472 U.S. at p. 329), and given the "intolerable danger" that this jury chose to minimize the importance of its role (*id.* at p. 333), defendant's death sentence should be reversed.

### III.

The juror misconduct here is far more prejudicial than the juror misconduct that occurred in *Mincey, supra,* 2 Cal.4th at pages 465–466, a case in which a juror brought the Bible into deliberations and several jurors read the same passages at issue here. We stated the test for juror misconduct in this situation as follows: "It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred. [Citation.] In criminal cases, the presumption of prejudice is rebutted when there is no substantial likelihood that the vote of one or more of the jurors was influenced by exposure to the improper material." (*Mincey, supra,* 2 Cal.4th at p. 467.) We held the juror misconduct in *Mincey* was nonprejudicial because (1) the Bible verses were read after deliberations concluded for the day, (2) the jurors did not discuss the verses, (3) the jurors were questioned by the trial court the very next day and stated that reading the Bible verses had not influenced their deliberations, and (4) the trial court admonished the jurors to decide the case solely on the evidence. (*Ibid.*)

But none of the above factors, which militate against a finding of prejudice, are present here. K.A.'s and B.P.'s juror misconduct was discovered after trial, so the trial court had no opportunity to undo the harm. Moreover, not only were the Bible verses read during deliberations, K.A. stated in her declaration they were read to jurors who had "expressed feelings about the difficulty and responsibility of making a life or death decision." In addition, unlike in *Mincey*, where the Bible verses were not discussed during deliberations, K.A. admitted not only that she told the other jurors about the scripture, but that the jurors' "Christian beliefs" were discussed during that Monday's deliberations,[6] prompting another juror to take offense later in the day. Juror E.M. corroborated the fact that such misconduct took place because she stated that during deliberations B.P. admitted that she sought her pastor's guidance. This was "egregious misconduct" because the pastors' assurances, K.A.'s and B.P.'s knowledge of the same, and the jury's improper discussion of biblical passages during deliberations "suggested that under divine law the proper penalty for defendant's crimes is death, always and automatically, regardless of the balance of aggravating and mitigating circumstances." (*People v. Slaughter, supra,* 27 Cal.4th at p. 1226 (conc. & dis. opn. of Kennard, J.); see also *Jones v. Kemp* (N.D.Ga. 1989) 706 F.Supp. 1534, 1558–1560 [constitutional error for trial court to grant jurors' request in death penalty case to bring Bible into deliberation room as "the confidence in the reliability of the jury's decision . . . may be undermined"].) The fact that the jury returned a verdict the following day is further evidence of the impact of the jurors' misconduct. The presumption of prejudice recognized in juror misconduct cases has not been rebutted here.

### IV.

Finally, the juror misconduct here undermines the integrity of the death penalty process. In *NeCamp v. Commonwealth* (1949) 311 Ky. 676 [225 S.W.2d 109], a case directly on point, the jury returned a death verdict. In the defendant's motion for a new trial, an affidavit was introduced by the Commonwealth of Kentucky in support of the verdict that provided that, during the course of deliberations, a juror told other jurors that "she had confided in her priest and he had advised her it was all right" to impose the death penalty because "it would not be any sin." (*NeCamp, supra,* 225

---

[6] The majority claims, based on this record, that "[w]e are not given any information as to what this discussion entailed." (Maj. opn., *ante,* at p. 313.) Not so. K.A. declared that she discussed and shared her highlighted copy of biblical passages from the Book of Numbers with undecided jurors; B.P. told jurors during deliberations that she asked her pastor for guidance as to the ultimate decision in this case; and this improper religious discussion was of such magnitude that a fellow juror finally took offense later in the day, stating that "God does not play a part in this decision." Simply stated, there is sufficient evidence in the record to determine the content of a portion of the jury's improper religious discussion. Like the proverbial ostrich, the majority ignores too much.

S.W.2d at p. 111.) In reversing the death judgment, the court stated: "In the present case, . . . we have an affidavit filed by the Commonwealth [that] . . . does in fact reveal misconduct as measured by the law. It is a disclosure made by the Commonwealth itself that the juror during the trial had conferred with another and carried the advice into the jury room. Perhaps this interpretation of the affidavit as being in support of and not to impeach the verdict is not the perfection of logic. But with the life of a man at stake, and that life to be taken by processes of the law, the reality and the actuality of the situation ought, under such circumstances, to be recognized. . . . The appellant, NeCamp, is shown to be a confirmed criminal, an enemy of society. But society cannot ignore its legitimate concept of justice even for such an insubordinate member. As stated by [Justice Frankfurter of] the Supreme Court of the United States not long ago in regard to a heinous crime: 'A shocking crime puts law to its severest test. Law triumphs over natural impulses aroused by such a crime only if guilt be ascertained by due regard for those indispensable safeguards which our civilization has evolved for the ascertainment of guilt. It is not enough that a trial goes through the forms of law. . . . Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment.' " (*NeCamp, supra,* 225 S.W.2d at p. 112, quoting *Fisher v. United States* (1946) 328 U.S. 463, 477 [90 L.Ed. 1382, 66 S.Ct. 1318] (dis. opn. of Frankfurter, J.); accord, *Ex parte Troha* (Ala. 1984) 462 So.2d 953, 954 [reversing rape conviction based on juror misconduct where juror stated in his declaration that he "felt compelled" during trial to ask his brother, a minister, "for guidance and scripture references so as to enable [him] to make a proper and just decision"].)

As in *NeCamp,* there is no denying the enormity of defendant's crimes. However, there is substantial evidence in the record that defendant's killings were not the acts of a cold, calculating, rational killer, but the acts of a highly disturbed, delusional, and mentally ill human being. It is therefore not surprising that the jurors struggled over their decision to impose the death penalty on this defendant. Indeed, the fact that two jurors actively sought advice on this very topic from their pastors is tangible evidence that defendant's fate was no foregone conclusion.

But K.A.'s and B.P.'s misconduct went far beyond the simple request for spiritual guidance found prejudicial in *NeCamp* and *Troha.* The two jurors received their pastors' assurances that the death penalty was the proper punishment for defendant. They carried these assurances into the jury room, further infecting the deliberative process. K.A. highlighted and shared with undecided jurors improper biblical material that advocated death for murderers without consideration of any mitigating circumstances that might have inured to defendant's benefit. B.P. discussed the fact that her pastor offered her guidance on this case. The jury's deliberative process was so permeated

with improper religious discussion, one juror was finally prompted to remind the group that such considerations were not supposed to be part of their decision. But the bell could not be unrung. The jury returned a death verdict the next day.

The degree of the juror misconduct here, in its totality, leads to the conclusion that K.A. and B.P. were improperly influenced by the events of the preceding weekend, tainting the jurors, the jury's deliberations, and the verdict itself. The fact that two jurors received approval from their spiritual leaders to impose a death sentence on defendant only serves to highlight the nature and degree of misconduct. While the majority seemingly contents itself by emphasizing the "strength" of the evidence against defendant, it is error to minimize the totality of the arrant juror misconduct here. "From the point of view of society, the action of the sovereign in taking the life of one of its citizens . . . differs dramatically from any other legitimate state action. It is of vital importance . . . to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." (*Gardner v. Florida* (1977) 430 U.S. 349, 357–358 [51 L.Ed.2d 393, 97 S.Ct. 1197].) The tainted penalty phase verdict falls far short of this standard.

I concur in the majority's affirmance of defendant's murder conviction and the special circumstance findings, but I would reverse the judgment of death.

George, C. J., concurred.

Appellant's petition for a rehearing was denied April 14, 2004, and the opinion was modified to read as printed above. George, C. J., Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.